Filed 5/31/18

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
        Plaintiff and Respondent, )
)         S057156
        v. )
)         Sacramento County
CHARLES EDWARD CASE, )         Super. Ct. No. 93F05175
)
        Defendant and Appellant. )
_____)

Defendant Charles Edward Case was sentenced to death for murdering two people during the commission of a robbery. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We conclude the restitution fine must be reduced by the amount defendant was ordered to pay in direct victim restitution, but we affirm the judgment in all other respects.

## I. STATEMENT OF THE CASE

Defendant was charged by criminal complaint with robbery and with the first degree murders of Val Lorraine Manuel and Gary Duane Tudor (Pen. Code, §§ 187, subd. (a), 211) with the special circumstances of multiple murder (*id.*, § 190.2, subd. (a)(3)) and murder during the commission of a robbery (*id.*, § 190.2, subd. (a)(17)(A)). The complaint alleged that defendant personally used a firearm in committing the murders. (*Id.*, § 12022.5, subd. (a).) Following a preliminary hearing, defendant was held to answer on all charges and allegations and an information was filed. The information later was amended to add an

**SEE CONCURRING AND DISSENTING OPINION**

allegation that defendant personally used a firearm in committing the robbery. (*Ibid.*)

A jury convicted defendant of all charges and found all allegations true. After the penalty phase, defendant was sentenced to death on the murder counts and to a consecutive term of three years in prison on the robbery count as well as two five-year enhancements for personally using a firearm during the commission of the murders. The court stayed a four-year enhancement for personally using a firearm during the commission of the robbery. The court imposed a restitution fine of $10,000 and ordered direct victim restitution in the amount of $4,000.

## II. STATEMENT OF FACTS

### A. Guilt Phase

#### 1. *The Prosecution's Case-in-Chief*

In June 1993, defendant was living with Jerri Baker, with whom he also worked at McKenry's Drapery Service in Sacramento. On June 20, the day of the robbery and murders, defendant left their house at about 3:00 or 4:00 in the afternoon. He was wearing a shirt Baker had bought for him and drove Baker's car, a Ford Probe. He said he was going to play pool.

Defendant picked up Susan Burlingame, an acquaintance with whom he had formerly had a romantic relationship, around 4:00 p.m. He took her to a bar and card room called The Office, where they shot pool. Burlingame lived with her daughter and son-in-law, Stacey and Greg Billingsley, both of whom also worked at McKenry's. Burlingame told defendant she had heard he had reunited with Jerri Baker and she did not want to come between them. Defendant and Burlingame left The Office. At her request, defendant dropped Burlingame off at a fast-food establishment near her daughter's house. As he left, defendant remarked that he had "some things to do." Burlingame arrived home about 7:45 or 8:00 p.m.

At about 8:30 p.m. on the same day, Tracy Grimes went to The Office to see Val Manuel, The Office's bartender. Grimes saw defendant there. Grimes also saw Gary Tudor, a customer who sometimes helped Manuel close the bar. Manuel told Grimes she was going to close the bar in about 15 minutes. Grimes left after a short visit.

Anita Dickinson and her fiancé, Randy Pickens, lived in a trailer behind The Office in exchange for cleaning the bar. Dickinson was outside the trailer sometime between 7:30 and 8:45 p.m. when she heard a gunshot. She ducked behind her car. When she heard two more gunshots, she ran into her trailer and yelled to her fiancé that someone was shooting in the bar. Pickens said it might have been firecrackers, so they did not notify the authorities.

Leslie and Joe Lorman were friends of Manuel and Tudor. Driving past The Office around 9:00 p.m., they noticed Tudor's truck parked outside and decided to stop and visit Tudor. The lights inside the bar were on, but they were surprised to find that the front door was locked. They entered the bar through the side door, calling Tudor's name. Leslie went to use the women's restroom and saw the bodies of Manuel and Tudor when she opened the door. The Lormans ran out of the bar and called the police.

Sacramento County Deputy Sheriff Craig Norris received a radio call at 9:43 p.m. directing him to go to The Office. He was the first of several law enforcement officers to arrive. Deputy Norris and another officer entered the bar through the side door and Deputy Norris found the bodies of Manuel and Tudor in the women's bathroom in a pool of blood. The cash register was open and there were no bills inside, just some pennies. The owner of the bar later determined that $320 had been taken.

A .45 caliber shell casing was discovered on the floor near the cash register and there was a depression in the floor that appeared to have been caused by a

3

bullet.  There were several more .45 caliber shell casings, as well as expended bullets, in the women's bathroom.

An autopsy later revealed that both Manuel and Tudor had been shot in the head twice from close range.  Both victims likely were either crouched down or kneeling when they were shot.

Defendant arrived at the home of Mary Webster about 10:00 p.m. that night.  Webster testified that she had met defendant about a year earlier through a personal ad she had placed in the newspaper.  A few days after they met, they went to The Office together for some drinks.  They began dating regularly and defendant moved in with Webster after a few weeks.  They lived together from July 1992 until March 1993, when defendant moved in with Baker.

Defendant described himself as a bank robber.  He bragged about it and told stories about it "every night."  According to Webster, "he loved it."  He said that he used a product called Nu-Skin to mask his fingerprints.  He owned a .45 caliber automatic pistol that he had purchased with money he borrowed from Webster.

On the night of the murders, defendant arrived at Webster's home driving Jerri Baker's car.  He "had a big wad of money" and gave Webster $125 in small bills to settle a bet they had made.  When defendant entered the bathroom and took off his shirt, Webster saw it "was full of blood."  He took off his cowboy boots, which Webster had bought for him, and Webster saw there was blood on the boots as well.  She began trying to clean off the blood, but defendant said it would not come off.  Defendant washed his arms, which were "saturated with blood, just layers and layers," and asked Webster to "get rid of" his shirt and boots.  At defendant's request, Webster retrieved defendant's gun from the passenger seat of Baker's car.  Defendant removed the bullets and gave the gun back to Webster; she put the gun in her closet.

4

Defendant told Webster he had been in a card game in Del Paso Heights and had shot two Black men who had tried to prevent him from collecting his winnings. No double-victim assaults or homicides were reported in Del Paso Heights around that time. Before he left, defendant kissed Webster and whispered in her ear that he probably would get caught because he left fingerprints. After defendant left, Webster threw defendant's bloody shirt and boots in a dumpster by some nearby apartments.

Defendant returned home after 11:00 p.m. He told Baker he had killed two Black men during a poker game in Del Paso Heights. Baker later checked the pockets of the pants defendant was wearing and found about $40.

Defendant did not go to work the next morning. He asked Baker to tell people at work that his mother was ill and he had gone to Indiana to be with her. He also told Baker she "should clean up the car especially around the driver's seat, door handles, foot pedals, steering wheel." Baker testified that she did as instructed, using "dry cleaning spotting chemicals, specifically ammonia," to wipe down everything she "could think of to wipe down." Baker testified that "[b]lood turns green in ammonia, so the rag had some green where I was wiping it down." She added: "There was a glop of what appeared to be flesh or I took it to be brain matter or something along those lines. I wiped that off before I could even get in the car."

Sheriff's department criminalists later detected small amounts of human blood on the gear shift knob and steering wheel of Baker's car. The amounts were too small for the blood type to be determined.

When Webster woke up the next morning, she telephoned a Sacramento Police Department detective she had met and asked him for advice. At his direction, she retrieved the shirt and cowboy boots from the dumpster. She then waved down a passing sheriff's department patrol car and told the deputy what

5

had happened. He escorted her to the sheriff's department and introduced her to Detectives Stan Reed and Darryl Edwards, who were investigating the murders at The Office. The deputy gave the detectives the clothing. Human blood was detected on the shirt and the cowboy boots. The blood type was the same as Val Manuel's, and also was consistent with blood that came from both victims. The blood on the clothing could not have come from defendant. Webster gave Detective Reed $100 that defendant had given her, consisting of three $10 bills, ten $5 bills, and twenty $1 bills.

Webster described to the detectives her encounter with defendant the previous night. An audiotape of her statement was played for the jury. Webster agreed to accompany the detectives to her house to retrieve defendant's gun but before leaving, Webster called her home to speak to her son and was surprised when defendant answered the telephone. She motioned to the detectives that defendant was on the telephone and they recorded the call. The tape recording of the telephone conversation was played for the jury. Defendant asked her if she had gotten "rid of the stuff" and she said she had. Defendant asked if she had put it all in one place, and she assured him she had not.

The detectives went to Webster's home and arrested defendant. Detective Reed retrieved defendant's .45 caliber automatic pistol, which was in a box on a shelf in a closet in the master bedroom. Human blood was later detected on the gun. Ballistics tests revealed that the shell casings and bullets recovered from the scene of the crimes had been fired from this gun.

Jerri Baker testified that in the spring of 1993, defendant told her that he wanted to commit robberies but feared going to jail if he did. He said he would have to kill any witnesses if he did commit robberies so that he would not go to jail.

6

Greg and Stacey Billingsley testified that defendant admitted he had been in prison and described himself as a bank robber. Defendant owned a handgun, which Greg had borrowed before going on a camping trip. Greg returned the gun to defendant a couple of months before the crimes. The weekend before the crimes, defendant spent the night at the Billingsleys' and slept on the couch. The next morning, Greg found the gun under the couch. Greg returned the gun to defendant a few days before the crimes. The gun resembled the gun Detective Reed retrieved from Webster's home.

Greg Billingsley also testified that the same year the crimes were committed, defendant asked him if he "wanted to do a job with him" by helping him rob a woman on her way to make a bank deposit. Greg declined, saying, "[N]o, that's not for me."

Another friend of defendant's, Billy Joe Gentry, testified that about a year before the crimes, defendant said he planned to buy a gun; defendant later showed Gentry the gun he had obtained. A short time later, defendant asked him if he would like to earn some money "being a driver in a hold-up." Gentry declined.

### 2. *Defendant's Case*

A defense criminalist testified that Nu-Skin was ineffective in hiding fingerprints and defendant's boots could not have made some bloody footprints found on the floor of The Office. After examining the shirt that Webster said she had gotten from defendant, the criminalist concluded that "just from the shooting, you wouldn't necessarily expect there to be any blood on the shirt of the person doing the shooting. . . . [I]t would only be on that part of the shirt that's exposed facing the area of the blood. So it doesn't really account for the blood on the back of the shirt, for example, . . . . And it certainly doesn't account for the large transfer on the left sleeve. That's a contact transfer, and it means that that sleeve

7

of the shirt was in touching contact with the source of the blood." He testified that the blood on defendant's boots also looked "like a transfer" and could have been "a smear of blood." Finally, the defense criminalist said that if the shooter was wearing defendant's shirt, he "certainly wouldn't be surprised" to find blood stains on the shooter's pants as well. The criminalist did not believe the blood on the clothing "resulted from the shooting itself" and said it was possible that someone took the shirt and boots into the crime scene and deliberately put blood on them. Finally, the criminalist testified that cleaning human blood with ammonia produces a reddish color on a rag, not green.

Mary Webster's brother, Steven Langford, testified that he was living with Webster in 1993. On the night of the murders, defendant arrived at Webster's house between 10:00 and 10:45 p.m. Langford let defendant in and, as defendant passed him and entered Webster's bedroom, Langford noticed that defendant "had something plastered all over his shirt." When defendant came back into the living room 15 to 20 minutes later, he had changed his clothes. Defendant said that he had been in a card game in Del Paso Heights and had "shot two colored people."

According to Langford, defendant asked Webster to retrieve his gun from the car he had driven, and she did so. The gun was so warm that Langford did not want to touch it. Langford acknowledged that he had told the district attorney and the investigator that he had retrieved the gun from the car. Langford also said that the substance that "was plastered" on defendant's shirt did not look like blood. Webster took the gun into her bedroom.

Margaret Cari testified she was a friend of Jerri Baker's and had worked with her at McKenry's Drapery Service. Cari recalled Baker telling her that on the night of the murders, Baker was in bed when defendant arrived; he got into bed and she rolled over and went to sleep.

8

Jean McKenry testified that defendant worked at her establishment as "a presser" and served customers at the counter. McKenry could not recall if defendant worked on Saturdays, but the employee on Saturday would pay him or herself $40 from the cash register and put the day's profits in a safe on the premises.

An employee of Wells Fargo Bank testified that over a two-year period, Clyde Miller, an elderly widower who suffered from Alzheimer's disease, made approximately 100 withdrawals, always accompanied by Mary Webster. In 1991, the bank employee became concerned and contacted the county conservator. In June 1991, a financial conservatorship was imposed on Miller.

In 1991, Webster presented to Wells Fargo Bank two insurance checks payable to Clyde Miller. One check for $2,000 was cashed and the other, in the amount of $6,000, was deposited into Webster's account. The bank employee who handled the transaction did not know that the Conservator's Office had placed stop payments on both checks.

Joan Cooney, a Deputy Public Guardian for Sacramento County, testified that on June 21, 1991, she received a telephone call from a woman who identified herself as Mary Webster. The woman angrily demanded that Cooney remove the stop payments "because the bank was trying to get the money back from her." Cooney refused, informing the woman that Miller was under conservatorship. The woman cursed at Cooney and terminated the call.

Dale Michels had lived with Webster. Clyde Miller had been Michels's grandfather's best friend. Michels testified that Webster stole the wedding ring set of Miller's deceased wife.

Jerri Baker's sister, Loureen Gilmore, worked with Baker at McKenry's Drapery Service. Gilmore and her 19-year-old son, Brian Webber, had also lived

9

with Baker in 1993. Gilmore did not recall ever seeing defendant with a handgun, "although [she] heard talk of one."

Defendant called as a witness Detective Reed and asked him about his pretrial interview of Tracy Grimes, who had testified to seeing defendant at The Office shortly before the murders. Detective Reed testified that Grimes had told him a White male in his fifties with graying hair combed back wearing jeans and cowboy boots had been playing pool in the bar. Grimes had seen this person playing pool there on previous occasions, including the night before the murders. Grimes indicated that he would recognize this person if he saw a photograph and Detective Reed indicated he would make arrangements in the near future to show him some photographs, but never did so. Had he done so, he would have shown Grimes a photo lineup of five or six photographs of different people, including defendant.

Tony Gane, an investigator for the defense, testified about a conversation he had with Steven Langford. Langford said he had retrieved defendant's gun from the car defendant had been driving on the night of the murders. According to Gane, Langford said: "I don't recall seeing any blood on it. I almost touched it but didn't. I reached down to touch it, and I could feel the warmth of the metal radiating from it. I assumed that it had been fired recently." Langford gave the gun to defendant, who took it into Mary Webster's bedroom.

Defendant called the prosecutor as a witness. The prosecutor testified that he met briefly with Greg Billingsley during a break in the defense cross-examination. Greg looked upset. The prosecutor asked what was wrong and Greg replied that he could not understand why defendant was permitting his attorney to try to make Greg "look like a fool" when Greg knew "so much more" about defendant. The prosecutor asked what he meant, and Greg explained that defendant had asked him "to do a robbery with him." The prosecutor said, "just

10

hold on" and took Greg into the courtroom, outside the presence of the jury, to have him "testify so that everybody gets to hear this at the same time."

### 3. *The Prosecution's Rebuttal*

The prosecutor called members of Baker's family to establish on rebuttal that no one had bled inside Baker's car. Baker performed a demonstration by using a solution of ammonia, soap, and water on a rag to remove some of her blood from a porcelain dish, which produced "an olive drab green" color.

A sheriff's department crime scene investigator testified in response to defense expert testimony that a bloody shoe print could not have been made by defendant's boots. The investigator testified that the print was made by "the people from the morgue as they removed the decedents from the bathroom."

The prosecutor introduced portions of defendant's pretrial statement in which defendant acknowledged having seen on a television news broadcast that a homicide had occurred at The Office the night before. He admitted he had been at The Office that night with a woman named Sue, having driven there in Jerri Baker's Ford Probe. He took Sue home about 6:00 or 7:00 p.m. and then returned to The Office and shot pool by himself until the bartender said the bar was closing at about 9:00 p.m. Defendant said that at that point, "there wasn't nobody in there but me and this other guy anyway" but insisted that the victims were alive when he left the bar.

When asked how he could explain the clothing the detectives had gotten from Mary Webster, defendant insisted he had no idea what Webster was talking about. Defendant said to the detectives: "I guess you'll have to talk to Mary about that." He said he had "no idea" whether the blood on the clothing was going "to match the people over there in The Office bar." He admitted the clothes were his and explained that he had gotten "blood on 'em from shaving." Detective

11

Edwards remarked that he did not "see any marks on [defendant] from shaving" and defendant replied that he "healed fast."

### B. Penalty Phase

#### 1. *Prosecution's Evidence*

The prosecution introduced evidence that defendant had previously been convicted of first degree robbery and served a term in prison. In another case, defendant was convicted of multiple counts of assault with a deadly weapon, oral copulation, rape, robbery, and attempted rape and sentenced to more than 33 years in prison. Defendant also had suffered convictions in Indiana for burglary and escape.

Relatives of the victims described the impact the murders had on the victims' families.

Sally S. testified that in 1978 she was working as a salesperson in a retail store when defendant entered, produced a handgun, ordered her to be silent, and struck her on the head with the gun, knocking her to the ground. Defendant took her and a fellow employee to another area in the store where he raped Sally S. After warning the employees that he would come back and kill them if they identified him, defendant took some money from the office and left.

Bettie H. testified that in 1978 she was working as a salesperson in a shoe store when defendant followed her into a back room, grabbed her by the hair, put a gun to her head and threatened to "blow [her] head off." At defendant's direction, she put about $35 from a cash drawer into a paper bag and gave it to defendant. He forced her to orally copulate him and then he raped her. He bound her ankles and wrists with tape and "stomped on [her] face" after she fell to the floor. Before he left, he threatened to come back and kill her and her children if she called the police.

12

Virginia P. owned a flower shop in 1978. Defendant entered holding a gun and said, "this is a robbery." Defendant bound her ankles and wrists with tape and struck her in the face. He took her rings and watch and threatened to rape her but left after threatening to come back and kill her if she screamed or called out.

In 1974, Delores Ogburn was a waitress and cashier at an all-night restaurant. One morning around 4:30 a.m., defendant came up behind her holding a steak knife. She tried to escape, but he cut and punched her, knocking her to the floor. He took money from the cash register and, as he left, threw an older woman against a table, breaking her ribs.

In 1978, Patricia J. worked in a "small ladies dress shop." One morning, defendant entered just after she opened the shop at 10:00 a.m., put a gun to her head, and ordered her into a back room where he bound her ankles and wrists. Defendant threatened to rape her or force her to orally copulate him and struck her on both sides of her head. He took her billfold and some jewelry, including her wedding rings, her watch, and some money from the cash register and left.

Tennye Pettinato was sitting in the dress shop she owned in 1978 when defendant came in, drew a handgun, and ordered her into the back room, where he bound and gagged her. Defendant took the rings off her fingers and money from the cash register. He left when the telephone rang.

### 2. *Defendant's Evidence*

Dode Hall testified that as a teenager he had been incarcerated with defendant in the Indiana State Reformatory. He described the horrible conditions, including the threat of rape and assault. They remained friends after release and Hall drove the getaway car for one of defendant's robberies. Defendant liked to brag about his exploits. Defendant came from a poor family and drank heavily. Defendant had been married, but separated from his wife.

13

Jerry Stokes was physically unable to travel from Indiana but was deposed telephonically. Portions of his deposition were read to the jury. He testified that he and defendant met in an orphanage when they were young teenagers. He described the horrific conditions, including beatings and torture by the staff and sexual assault by older orphans. Defendant and Stokes frequently ran away but each time were found and returned to the orphanage. Stokes met defendant's family and once saw defendant's father sexually abuse defendant. Defendant drank alcohol "as far back" as Stokes could remember. Defendant was "not the same person" when he was drinking. He would "get mean." Stokes later served time in state prison with defendant and defendant was raped there.

Dennis Barnes had been incarcerated at Folsom State Prison since 1982. He testified that he met defendant there in 1984. Barnes said there were many "race problems" at the prison that resulted in "a lot of stabbings and killings." He described defendant as "a nice guy" who followed the rules and got along well with other inmates and the staff.

William Mayfield shared a cell with defendant at Folsom Prison starting in 1986. Folsom Prison was "a very scary place." Defendant helped him learn the unwritten rules and "morals" he needed to understand in order to survive.

Gretchen White testified as a clinical psychologist that she interviewed defendant and examined various records, including interviews of defendant's friends and family members, documents from the orphanage, medical records, his juvenile file, and prison records. In White's expert opinion, defendant was "unable to function outside of an institution" because he had been institutionalized beginning at age 12 and came from "a multi-problem family" that "had biological or genetic or physiological kinds of problems." Defendant was the sixth of nine children. Several of defendant's siblings suffered from epilepsy and one was developmentally disabled. Defendant's father worked as a truck driver and often

14

was gone. When he was home, he often was drunk and would fight violently with defendant's mother.

Defendant's parents divorced in 1957 and his mother worked two jobs to support the family, leaving the children "completely unsupervised." This led to "a lot of fighting among the siblings." When he was 12 years old, defendant was sent to the Knox County Children's Home because he was "incorrigible" and was "stealing things" and "mouthing off to his mother." White characterized the home as "a fairly brutal cold place to be housed." She described severe punishment, mistreatment, and torture.

Defendant left the Children's Home at age 16. When he was 17 years old, he was sent to Pendleton Reformatory, which actually was "a State Prison where the younger inmates were sent." It was "a very frightening and dangerous place." While defendant "functions very well within a structured setting," he "never was able . . . to develop any kind of internal controls. He moves when he's on the outside from impulse to impulse." And because he had been abused, defendant has "quite a lot of anger and resentment." "When he's on the outside, [defendant] could basically be called an alcoholic," and alcoholism runs in defendant's family.

Eldred Lewis had been a guard at Folsom State Prison for 20 years and had supervised defendant. Lewis described defendant as a "good worker" who did not cause problems. Amos Griffith was "a maintenance man" at Folsom Prison who knew defendant and kept in touch with him after defendant was released. Griffith said defendant was "very good" at his job at the prison, was polite to other inmates, and did not get into trouble. Challough Randle supervised defendant at his job in Folsom Prison. Defendant did "a good job" and received many "exceptional" ratings for his job performance. He did not give the staff or his fellow inmates "any problem."

15

Following his retirement from the Department of Corrections and Rehabilitation, James Park, who was trained as a clinical psychologist, consulted as a prison expert. He described "what happens to a prisoner if he gets life without the possibility of parole." He described the different classifications of prisons in California and explained in detail the conditions of confinement of a prisoner serving a term of life without possibility of parole.

### III. DISCUSSION

#### A. Pretrial Issues

##### 1. *Compliance with* Miranda v. Arizona

After defendant was arrested, he was interrogated at the sheriff's department by Detectives Darryl Edwards and Stan Reed. Before trial, defendant moved to suppress his pretrial statements on the grounds that his "Fifth and Fourteenth Amendment rights against self-incrimination and to have an attorney present during questioning were violated and that the ensuing statement was a product of coercion and thus, involuntary." He also sought to suppress the testimony of Susan Burlingame, Stacey Billingsley, and Greg Billingsley as the fruit of illegally obtained statements. In the alternative, defendant sought to suppress both his pretrial statements and this witness testimony as fruit of a warrantless arrest unsupported by probable cause. The trial court rejected both arguments. On appeal, defendant does not pursue his claim that his warrantless arrest was unlawful. He does, however, argue that the detectives violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) by continuing to question him after he invoked his right to remain silent. He also argues that his statement was involuntary. For both reasons, he argues, the statement, as well as any derivative third-party witness testimony, should have been suppressed.

The detectives' interrogation of defendant began as follows:

16

"REED:  Do you know what this is all about?

"CASE:  No (shakes head).

"REED:  Okay. . . .  Ah, we're investigating a homicide that occurred out on Jackson Highway and Bradshaw Road.  Occurred last night.  You may have seen it on the news.

"CASE:  Yeah.

"REED:  Okay.  It's a robbery/murder.  Two people were killed out there.  In the process this morning of investigating this, we ran into a lady who had some clothing in her possession that had blood on it.  And, ah, in the process of asking where it came from, ultimately she told us, reluctantly, but she told us.  So that's why we came out to have a talk with you.  Ah, we'd like to talk to you about it, but because of the circumstances of the robbery and the murder out there and the bloody clothing and all that, ah, I'm going to have to advise you of your rights first."

Detective Reed then advised defendant of his *Miranda* rights and confirmed that defendant understood them.  The colloquy continued:

"REED:  Having those rights in mind, will you talk to me now?

"CASE:  No, not about a robbery/murder.  Jesus Christ.

"REED:  Okay.  Okay.  As far as, um, any questions about where you're living and stuff, we'd like to get some of that information from you so we can get you identified and everything.  What's your full name?"  After defendant answered approximately 15 questions about his identity, his residence, and where he worked, Detective Reed asked the following:

"REED:  Care to tell us where you were at last night?

"CASE:  I was at the Office last night with my girlfriend.

"REED:  At the office at the Dry Cleaners?

"CASE:  No, no.  Jackson and Kiefer Boulevard.

17

"REED: Oh, you were there with your girlfriend?

"CASE: Yeah. Damn near all night until about 9:00 o'clock."

Detective Reed testified at the suppression hearing that he continued interrogating defendant because he understood defendant to mean he did not wish to talk about the robbery-murder but was "willing to talk about other things." Detective Reed explained that this was what he felt defendant "was implying, that he was still willing to talk to me, just not about the murder or the robbery." Detective Reed accordingly asked defendant about other matters, such as where he was living, and then asked whether defendant would say what he had done the night before. Defendant answered the question with no hesitation.

Detective Reed acknowledged that, in general, it was his habit to continue to interrogate a suspect who invoked his *Miranda* rights to obtain statements that might be admissible to impeach the suspect. (See *Harris v. New York* (1971) 401 U.S. 222, 225–226 [although statements elicited in violation of *Miranda* are generally not admissible, statements that are otherwise voluntarily made may be used to impeach the defendant's trial testimony].)[1] But Detective Reed

---

[1] Lest there be any doubt, we emphasize that the general tactic Detective Reed described is clearly improper: Officers may not deliberately continue to question a suspect after the suspect has invoked the right to remain silent, no matter how useful they might find the suspect's answers. Justice Baxter's statement in his concurring opinion in *People v. Neal* (2003) 31 Cal.4th 63, 90–91, bears repeating: "California courts have time and again noted and decried deliberate police use of tactics that violate *Miranda* standards. . . . It could not be clearer that efforts to gather court evidence by such means are improper. [¶] Given this history, it is unconscionable for police departments or supervisors to give contrary instruction or encouragement to the officers under their jurisdiction. Law enforcement agencies have the responsibility to educate and train officers carefully to avoid improper tactics when conducting custodial interrogations. Officers must be made aware that they have an absolute obligation to play by the rules when questioning suspects in custody, and that their deliberate failure to do so will be severely disciplined. There can be no suggestion—formal or informal, direct or

*(Footnote continued on next page.)*

18

maintained that he had not employed that policy in this case because defendant never invoked his *Miranda* rights. Detective Reed explained: "[Defendant] didn't invoke his right to an attorney. He didn't invoke his right not to talk to me. He just didn't want to talk about a robbery/homicide which, in my experience, that's the case with all these people. That's why they call it an interrogation. In my opinion, we got past that without a problem. . . . He still talked freely and voluntarily." Detective Reed explained that if, following *Miranda* advisements, a suspect "says to you, no, I've got nothing to say to you, then that's the end of it. But this was very specific, no, not about a homicide/robbery."

After a break in the interrogation, Detective Reed reentered the room and said, "let me see if I'm understanding something. When I advised you of your rights, you just didn't want to talk about the murder and the robbery, but you wanted to talk about your alibi and that sort of thing; is that right?" Defendant answered, "I don't know if I've got an alibi." Detective Reed asked whether defendant wanted to talk to him about other things but not about the robbery-murder and defendant replied, "Well, that's what it is, ain't it?" After briefly discussing other matters, defendant denied robbing or killing anyone. Detective Reed testified at the hearing that he brought up the subject for the sake of the record: "I knew I'd be sitting here on this [witness] stand at this hearing and I

*(Footnote continued from previous page.)*

indirect—that improper interrogation tactics are required, encouraged, approved, condoned, or tolerated. Exactly the opposite impression must be conveyed to each and every officer. Only in this way can the police perform the crucial responsibilities they carry." (Fn. omitted.)

19

wanted it as clear as possible. . . . And I wanted to try to express as much as possible so that the learned attorneys might understand what he meant."

The trial court concluded that the detectives did not violate *Miranda* by continuing to question defendant after he responded to the detectives' question about whether he wanted to speak with them by saying: "No, not about a robbery/murder." The trial court reasoned that defendant did not terminate the interrogation or invoke his right to silence, but indicated only that he was unwilling to discuss certain subjects. The trial court also rejected defendant's argument that his pretrial statements were the product of police coercion: "[T]he Court has reviewed the videotape, and the Court has observed the testimony. The Court has in mind [the] setting of the interrogation, the style of the interrogator, Mr. Case's past, which was alluded to and Mr. Case's conduct during the time that he was in the interview room undergoing questioning. All of those things lead the Court to believe that the statements were not the product of coercion."

On review of the trial court's ruling, "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

Defendant asserts that he was denied his right to remain silent under the Fifth and Fourteenth Amendments to the United States Constitution because he unambiguously invoked his right to remain silent when Detective Reed, having advised defendant of his *Miranda* rights, asked defendant whether he would talk to him, and defendant responded: "No, not about a robbery/murder, Jesus Christ." At that point, defendant argues, the police questioning should have stopped. The

20

Attorney General disagrees that the detectives were required to stop questioning entirely, arguing that defendant had merely refused to discuss certain subjects. But shortly before oral argument, the Attorney General conceded that detectives crossed the line when they asked defendant whether he was at The Office bar on the night of the murders, and agreed that defendant's subsequent statements— which includes the bulk of the evidence admitted at trial—should have been excluded. The only statement that properly came in, according to the Attorney General, was defendant's answer to the immediately preceding question, which asked defendant whether he "cared to" tell detectives where he was on the night of the murders. We accept the Attorney General's concession, but we conclude that this preliminary question, too, crossed the line, and that all of defendant's statements therefore should have been excluded at trial.

Under *Miranda*, police officers must warn a suspect before questioning that he or she has the right to remain silent and the right to the presence of an attorney. (*People v. Williams* (2010) 49 Cal.4th 405, 425.) "Once warnings have been given, the subsequent procedure is clear. If the individual indicates . . . that he wishes to remain silent, the interrogation must cease." (*Miranda*, *supra*, 384 U.S. at pp. 473–474, fn. omitted.) To end the interrogation, the suspect must invoke the right to silence unambiguously. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381–382.) "If an accused makes a statement . . . 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, [citation], or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights [citation]." (*Id.* at p. 381.) But if the defendant "articulate[s] his desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand" it as a request to terminate the interrogation, the request must be honored. (*Davis v. United States* (1994) 512 U.S. 452, 459.)

21

In this case, defendant was asked whether he would talk to the detectives and answered no. This seems clear enough. But Detective Reed found the answer to be ambiguous because defendant added, "not about a robbery/murder, Jesus Christ." Detective Reed believed that defendant had not invoked his right to remain silent because defendant "didn't invoke his right not to talk to me. He just didn't want to talk about a robbery/homicide."

Of course, the detectives had just told defendant that he was there, handcuffed to a table, because they were investigating a robbery-murder. The robbery-murder was the only subject under discussion. The Attorney General nevertheless argues that the detectives reasonably understood defendant's statement as only a partial invocation of the right to remain silent—an indication that defendant was unwilling to discuss the "details of the crimes," but not unwilling to talk to the detectives about the robbery-murder *at all*. The Attorney General, like the trial court, relies on decisions of this court that have found partial or selective invocation of the right to silence under certain circumstances. (*People v. Silva* (1988) 45 Cal.3d 604, 629–630; *People v. Ashmus* (1991) 54 Cal.3d 932, 969–970; and *People v. Clark* (1992) 3 Cal.4th 41, 120–122.) These cases are, however, distinguishable: In each of these cases, a suspect who had waived his *Miranda* rights later declined to talk about a particular topic. In each case, the court held that the suspect's efforts to cut off a particular line of questioning did not require officers to stop their questioning altogether. Here, by contrast, defendant never expressly waived his *Miranda* rights; there was no " 'interrogation already in progress.' " (*Silva*, *supra*, 45 Cal.3d at p. 630; *id.* at p. 629.) Instead, before the interrogation got underway, defendant invoked his right not to talk to detectives about the only crimes they were investigating.

Ultimately, however, we need not decide whether it was reasonable under the circumstances for the detectives to interpret defendant's response as a refusal

to discuss only certain subjects, because the detectives' questioning ventured into what all parties now agree was forbidden territory in any event. As noted, the Attorney General now concedes that the detectives violated defendant's invocation of his *Miranda* rights by asking defendant whether he was at The Office bar on the night of the murders. The only remaining question is whether, as the Attorney General argues, the detectives were on solid ground when they first asked defendant whether he "cared to" tell them where he was on the night of the murders.

We agree with the Attorney General that, objectively speaking, when detectives asked defendant whether he was at the scene of the murders on the night they occurred, the detectives were effectively asking defendant to talk about the robbery-murder—the very subject defendant told them he was not willing to speak about. But contrary to the Attorney General's argument, we see no meaningful distinction between the first question (whether defendant "cared to" tell detectives where he was on the night of the crimes) and the follow-up question, which simply asked defendant to confirm his previous answer that he was at The Office ("Oh, you were there with your girlfriend?"). Both questions were equally likely to elicit responses that transgressed any limitations on the scope of defendant's invocation of his *Miranda* rights.[2]

---

[2]      In his brief, the Attorney General asserted that when detectives began to ask defendant about his whereabouts on the night of the crime, defendant "was eager to discuss his alibi and clear his name." The argument that defendant had not, in fact, invoked his right not to talk about his whereabouts on the night of the robbery-murder might have force if defendant had volunteered an alibi even as he declined to talk to detectives. (Cf. *Bradley v. Meachum* (2d Cir. 1990) 918 F.2d 338, 343 ["Bradley cannot be said to have invoked his fifth amendment right regarding his willingness to discuss his involvement in the crime because, in the same breath, he denied any involvement."]; *Terrovona v. Kincheloe* (9th Cir. 1990) 912 F.2d 1176, 1180 ["Terrovona gave the detectives no indication that he

*(Footnote continued on next page.)*

23

Because defendant's pretrial statements were obtained in violation of *Miranda*, it was error to admit them. But the error does not require reversal of the judgment. "The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 . . . . That test requires the People . . . 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.) That test is met here.

The prosecution did not offer defendant's pretrial statement in evidence during its case-in-chief. Rather, on rebuttal, the prosecutor introduced portions of defendant's pretrial statement in response to "the credibility attack" on several of the prosecution witnesses. Detective Reed read portions of a transcript of the postarrest interrogation of defendant in which he acknowledged having seen on the television news that a homicide had occurred at The Office the night before. Defendant admitted he had been at The Office that night with a woman named Sue. He took Sue home about 6:00 or 7:00 p.m. and then returned to The Office and shot pool by himself until the bartender said the bar was closing at about 9:00

---

*(Footnote continued from previous page.)*

wished to remain silent. Rather, he offered an alibi to explain his whereabouts on the evening in question, indicating a willingness to talk."].) But this is not what happened. Immediately after defendant invoked his right not to talk about the robbery-murder, Detective Reed posed a series of questions seeking basic biographical data before turning to the question of defendant's whereabouts on the night of the crimes. Defendant responded that he was at The Office with his girlfriend. The record contains no indication that defendant simply volunteered the information, despite his earlier invocation of the right not to talk to the detectives about the robbery-murder.

p.m. Defendant said at that point, "there wasn't nobody in there but me and this other guy anyway."

Defendant said he had driven to the bar in Baker's Ford Probe. When asked how he could explain the bloody clothing the detectives had gotten from Mary Webster, defendant said, "I guess you'll have to talk to Mary about that." He said he had no idea what Webster was talking about. Detective Reed asked whether the blood on the clothing was going "to match the people over there in The Office bar," and defendant said he had "no idea." Defendant admitted the clothes were his and explained that he had gotten "blood on 'em from shaving," adding "the people were alive when I left the bar." Detective Edwards remarked that he did not "see any marks on [defendant] from shaving" and defendant replied that he "healed fast."

On appeal, defendant claims he was prejudiced by his statements admitting he had been at The Office the night of the murders, his admission that the bloody shirt and boots were his, and his statement that he had gotten blood on those clothes from shaving. But these statements were largely cumulative of other evidence. It was clearly established that defendant was at The Office before the murders; Susan Burlingame testified she accompanied him there and Tracy Grimes testified that he saw defendant there later that evening. There also was little doubt that defendant owned the bloody shirt and boots; Mary Webster testified she had purchased the boots for him and Jerri Baker said she had bought defendant the shirt. Although defendant attempted to undermine the credibility of these witnesses, prompting the prosecution to introduce defendant's statements in rebuttal, none of the efforts were to great effect. (See discussion at pp. 59-61, *post*.) And while a jury certainly might have regarded defendant's statement that he had gotten blood on his clothing while shaving as absurd, which would have affected his credibility, defendant's credibility was not at issue as he did not

25

testify. To the extent that this statement was probative of defendant's guilt, it was harmless beyond a reasonable doubt in light of the overwhelming evidence on the point. Given the slight probative value of defendant's improperly obtained statements, it is clear beyond a reasonable doubt that the erroneous admission of his pretrial statements did not contribute to the guilty verdicts.

Defendant next argues that the trial testimony of Susan Burlingame, Stacey Billingsley, and Greg Billingsley should have been excluded because Detective Edwards first learned of their identities when questioning him. Defendant argues that the trial testimony of these witnesses "was derivative of police coercion and of an interrogation technique deliberately designed to thwart *Miranda*'s protections" and therefore should be suppressed.

As a general rule, courts have held that a *Miranda* violation, unlike a Fourth Amendment violation, does not require "full application" of the " 'fruit of the poisonous tree' doctrine developed for Fourth Amendment violations." (*People v. Storm* (2002) 28 Cal.4th 1007, 1028.) This court has explained: "[T]he exclusionary rule serves different purposes under the Fourth and Fifth Amendments. Exclusion of statements or evidence obtained as the fruits of an unreasonable search or seizure prohibited by the Fourth Amendment is necessary to deter direct violations of that constitutional guarantee." (*Id.* at p. 1029.) "On the other hand, the Fifth Amendment, at bottom, protects against *compelled* testimonial self-incrimination. *Miranda* and its progeny are designed to allow *full understanding and exercise* of this constitutional right in the inherently custodial atmosphere of police custody. However, '[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. [Citations.]' [Citation.] Thus, such statements must be excluded even if they were '*otherwise voluntary* within

26

the meaning of the Fifth Amendment.' [Citation.] [¶] But it does not follow that the *fruits* of such an 'otherwise voluntary' statement are invariably tainted and inadmissible. . . . '[N]either the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence' would be served by suppressing the testimony of a witness whose identity was discovered as the result of a suspect's statement in custody which, though elicited without *Miranda* warnings, was otherwise uncoerced." (*Ibid.*; cf. *Michigan v. Tucker* (1974) 417 U.S. 433, 445–446 [declining to suppress testimony of witness whose identity was discovered through a suspect's statement given before the decision in *Miranda*, and thus without the benefit of *Miranda* warnings].)

Defendant argues that his statements were, in fact, coerced. Specifically, he argues that the detectives coerced him by continuing to question him after he clearly stated that he did not want to talk about the robbery-murder, which signaled to him that "they would not take 'no' for an answer." The problem, he argues, was compounded when the detectives told him that he could be subject to the death penalty for the crime.

Here, we agree with the trial court that defendant's statements were not the product of police coercion. As defendant acknowledges, our cases have held that a statement may be uncoerced even though the statement was elicited in violation of a defendant's invocation of *Miranda* rights. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1039 ["[J]ust as a failure to give *Miranda* warnings does not in and of itself constitute coercion [citation], neither does continued interrogation after a defendant has invoked his right to counsel . . . inherently constitute coercion."]; *People v. Peevy* (1998) 17 Cal.4th 1184 (*Peevy*) [statement was voluntary and therefore admissible for purposes of impeaching the defendant even though it was taken in purposeful disregard of the defendant's invocation of *Miranda* rights].) Of course, as defendant says, in some cases deliberately continuing to question a

suspect after he has invoked his *Miranda* rights may undermine a defendant's free will by signaling that "no" is not an acceptable answer. (See, e.g., *People v. Neal*, *supra*, 31 Cal.4th at p. 82 ["[I]n the course of the first interview, Detective Martin intentionally continued interrogation in deliberate violation of *Miranda* in spite of defendant's repeated invocation of both his right to remain silent and right to counsel. Martin's message to defendant could not have been clearer: Martin would not honor defendant's right to silence or his right to counsel until defendant gave him a confession."]; see *ibid.* ["From the fact of defendant's resistance, and Martin's overcoming of his resistance, we may infer that defendant received the message that Martin would not honor defendant's right to silence or right to counsel until defendant confessed."].) But here, the conduct of the interrogation did not communicate to defendant that detectives would not take "no" for an answer. Instead, on hearing defendant's refusal to talk about the robbery-murder, Detective Reed moved to basic biographical questions, and later sought to confirm that defendant wished to discuss "other matters," just not the robbery-murder— thereby signaling to defendant that Detective Reed intended to honor defendant's request, and was not deliberately disregarding it. Detective Reed's interpretation of defendant's request was, as we have seen, objectively unreasonable, but we cannot say it was calculated to break defendant's free will.

Nor do we agree with defendant that the detectives employed improper psychological coercion tactics. "In evaluating a claim of psychological coercion, the 'question posed . . . is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." ' [Citations.]" (*People v. Kelly* (1990) 51 Cal.3d 931, 952.) In *Kelly*, the court held that asking the suspect whether he was aware that he had "violated your Christian upbringing" and asking how his mother was going to feel were not unduly coercive. (*Ibid.*) We explained: "[N]one of the police

comments here appear to have been calculated to exploit a particular psychological vulnerability of defendant; no acute religious anxiety or sense of guilt was apparent from prior questioning, and defendant was not particularly moved by appeals to family, either the victim's or his own.  Indeed, at the conclusion of the officers' remarks, defendant adamantly denied any involvement in the crimes." (*Id.* at p. 953.)

In this case, the detectives told defendant he could be subject to the death penalty, that he had little chance of escaping conviction, that he would "be a whole hell of a lot better off if [he] just said . . . 'Got me,' " and that providing an explanation could benefit defendant "in the long run."  None of these comments appears calculated to exploit any particular psychological vulnerability. "Reference to the death penalty does not necessarily render a statement involuntary," and this is not a case in which " 'officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises.' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 443.)  Moreover, "there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials. . . .  Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth. [Citations.]" (*Id.* at p. 444.)  And significantly, throughout the interrogation defendant steadfastly maintained that he was innocent, which tends to undercut the notion that his free will was overborne by the detective's remarks.  (Cf. *ibid.* [considering it significant that defendant "continued to deny responsibility in the face of the officers' assertions"].)  Defendant's statements were taken in violation of the protections required by *Miranda*, but they were not coerced.

Finally, defendant maintains that even if his statements were voluntarily made, the trial testimony of the three witnesses should have been excluded as a sanction for the detective's deliberate refusal to honor his invocation of the right to remain silent. Defendant acknowledges that neither this court nor the United States Supreme Court has previously ordered such a remedy. In *Peevy*, this court concluded that the balance of interests did not warrant the exclusion of a statement that had been deliberately elicited in violation of *Miranda* for purposes of impeaching the defendant's trial testimony. (*Peevy*, *supra*, 17 Cal.4th at pp. 1193–1194; cf. *Harris v. New York*, *supra*, 401 U.S. at p. 224.) Defendant argues, however, that the balance of interests here is different, because there is no danger that excluding the witnesses' statements will turn the prophylactic *Miranda* rule into a shield for a defendant's perjury.

There is, however, an even more fundamental difference between *Peevy* and this case: there has been no finding that the detectives in this case deliberately violated *Miranda*. Detective Reed did acknowledge that, in general, it was his habit to continue interrogating a suspect who invoked *Miranda* to obtain statements that might be admissible to impeach the suspect. (That tactic, as we have explained, is clearly improper. (See *ante*, fn. 1.)) But Detective Reed maintained that he did not follow that policy in this particular case; he instead continued questioning defendant because defendant had not invoked his *Miranda* rights and simply "didn't want to talk about a robbery/homicide . . . ." The trial court accepted the detective's explanation, ruling that defendant did not terminate the interrogation or invoke his right to silence, but indicated only that he was unwilling to discuss certain subjects. As noted, we disagree with the trial court's legal conclusion that the detectives properly respected defendant's right to remain silent, but we accept the trial court's implicit finding that Detective Reed did not act in deliberate disregard of defendant's *Miranda* rights. We accordingly decline

30

defendant's invitation to exclude the trial testimony of the three third-party witnesses as a sanction for police misconduct.

### 2. Restricting Defense Voir Dire

Defendant asserts that the trial court violated his rights to trial by an impartial jury under the California and federal Constitutions by preventing defense counsel from asking prospective jurors whether they would consider specific mitigating factors in determining the appropriate penalty.

Before trial, each prospective juror completed a lengthy questionnaire to permit counsel to evaluate his or her views on the death penalty. The questionnaire asked the jurors, among other things, to express their "general feelings regarding the death penalty," to explain in what types of cases the death penalty should be imposed, and to state whether their feelings were "so strong" that they would "always" or "never" vote to impose the death penalty. To follow up on this line of questioning, defense counsel during voir dire asked a prospective juror to describe "in very general terms" how she felt about the death penalty. The prospective juror answered: "I believe in the death penalty for some cases. And I'm not sure how much of a deterrent it is." Defense counsel then explained that, if there was a penalty phase, "the District Attorney would put on testimony to prove to you factors in aggravation." When counsel began to list examples, the prosecutor objected on the ground that doing so would improperly ask the prospective juror "to prejudge specific types of evidence." The court sustained the objection. Defense counsel asked, without objection, whether the juror would "be willing to listen to the factors in aggravation and the factors in mitigation on both sides" and the prospective juror replied: "Yeah, I think I could do that." But when defense counsel asked, "[w]ould you be able to consider such factors in mitigation such as: A person's background, the defendant's background. Do you

31

think you could meaningfully consider—," the prosecutor again objected that the prospective juror was being asked to prejudge evidence.

Outside the presence of the jurors, defense counsel argued that "the jurors have to be able to say that they could meaningfully consider the evidence that's presented." The court ruled that defense counsel "can ask them if their minds are absolutely closed to mitigating evidence" and can explain that an extenuating circumstance is "something that's not a legal excuse for the crime but it's . . . [s]ome aspect of [the defendant's] character or some aspect of his life which may be grounds for something less than the death sentence." Terming it "a close question of semantics," the trial court ruled that defense counsel could not ask whether a prospective juror could give mitigating evidence "meaningful consideration" because that would be "asking them to give . . . greater weight to that type of evidence without hearing what it was." The court ruled that prospective jurors could be asked if they would "carefully consider" such evidence, adding: "then they are free to assign whatever weight they think it is entitled to." Nor was defense counsel permitted to ask questions such as whether the prospective juror would "be able to carefully consider such things as a person growing up in poverty," because that "asks them to prejudge the fact."

On appeal, defendant challenges the court's ruling. He argues that the inability to ask whether a prospective juror could carefully consider particular mitigating factors, such as defendant's impoverished childhood, "severely limited defense counsel's ability to ferret out prospective jurors whose ability to follow the law on mitigation was substantially impaired."

For his argument, defendant relies on *People v. Cash* (2002) 28 Cal.4th 703, 720–721 (*Cash*), which held that "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause

32

them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence."  In *Cash*, defense counsel was precluded from asking a prospective juror "whether there were 'any particular crimes' or 'any facts' that would cause that juror 'automatically to vote for the death penalty.' "  (*Id.* at p. 719.)  Defense counsel explained he was attempting "to determine whether prospective jurors could return a verdict of life without parole for a defendant who had killed more than one person, without revealing that defendant had killed his grandparents."  (*Ibid.*)  We held the trial court erred "by preventing all voir dire on the issue of prior murders."  (*Ibid.*)

Defendant also relies on *People v. Noguera* (1992) 4 Cal.4th 599, which held that a trial court did not abuse its discretion in permitting the prosecutor to ask prospective jurors whether the fact that the defendant was 18 or 19 years old at the time of the killing and had killed only one person would " 'automatically cause you to vote for the lesser punishment of life imprisonment without possibility of parole?' "  (*Id.* at p. 645.)  We held the questions were proper because they asked only whether the prospective juror "would *consider* the death penalty" under such circumstances.  (*Id.* at p. 647.)  "If a juror would not even consider the death penalty in such a case, he or she properly would be subject to challenge for cause."  (*Id.* at p. 646.)

Here, by contrast, defense counsel was not prevented from asking whether any aspect of the case would cause a prospective juror automatically to vote for the death penalty.  Rather, defense counsel was permitted to ask prospective jurors whether they could carefully consider mitigating evidence, which was defined for the jurors as an extenuating circumstance "that's not a legal excuse for the crime but it's . . . [s]ome aspect of [the defendant's] character or some aspect of his life which may be grounds for something less than the death sentence."  The narrow question here is whether the trial court erred in not permitting defense counsel to

33

give specific examples of such extenuating circumstances, such as growing up in poverty. As we explained in *Cash*, "death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*Cash*, *supra*, 28 Cal.4th at pp. 721–722; see also *People v. Winbush* (2017) 2 Cal.5th 402, 431 [Trial court did not err in preventing defense counsel from telling a prospective juror "about aggravating evidence that would likely be introduced at the penalty phase."]; *People v. Leon* (2015) 61 Cal.4th 569, 586 [Trial court did not err in excluding from the juror questionnaire "defendant's proposed question about an 'abuse excuse.' "].) The trial court here did not abuse its considerable discretion in striking the balance where it did.

## B. Guilt Phase Issues

### 1. Evidence of Defendant's Prior Bad Acts

Citing article I, sections 7, 15, and 17 of the California Constitution and the Fourteenth Amendment of the United States Constitution, defendant argues that the trial court abused its discretion in admitting evidence of several instances of uncharged misconduct committed by defendant. Defendant does not dispute that this evidence was relevant, but asserts the trial court abused its discretion under Evidence Code section 352 (section 352), which provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed

by the probability that its admission will . . . create substantial danger of undue prejudice . . . ."

### a. Altercations with Nivens and Hobson

Defendant contends the trial court erred in admitting evidence that some months prior to the robbery-murders, defendant had gotten into two physical altercations at Mary Webster's house: one with Greg Nivens, Mary Webster's son, and the other with Randy Hobson, Mary Webster's then-roommate.

During her testimony, Webster alluded briefly to both of these altercations. Webster acknowledged that law enforcement officers were called after defendant hit her son, but she testified that she "was on Case's side" and agreed with the prosecutor that she told the officers "something in favor of Mr. Case" and, as a result, "Mr. Case did not get in trouble." She also agreed with the prosecutor that defendant and Hobson had an altercation, that law enforcement officers were called, and that she took defendant's side and told "the officers some information that was to his benefit and actually wasn't true."

Nivens testified at trial about the details of the first altercation, which occurred while defendant was living with Webster. Nivens had some friends over and was "partying too hard." Webster told him to turn down the music, but he did not. Webster left and returned with defendant. Nivens was sitting on the grass outside of Webster's home when defendant walked up and punched him in the mouth. Nivens called the police, but no action was taken. The trial court admonished the jury that the evidence was admitted for a limited purpose: "It is not admitted to prove the defendant, Mr. Case's, disposition or his tendency to behave in a certain manner, but to establish the evidence as to the character of Mary Webster or her feelings toward Mr. Case. You can consider it for that purpose and for that purpose only."

35

Randy Hobson testified about the second altercation, which occurred when Hobson was Webster's roommate. One morning when defendant was at the house, Hobson asked Webster to pay him some money she owed him. Defendant began to speak, but Hobson told him it was none of defendant's business. Without warning, defendant struck Hobson on the leg with a fireplace poker. Hobson tried to take the poker from defendant's hands and they wrestled. Webster called the police and a uniformed officer soon appeared. Much to Hobson's surprise, Webster sided with defendant, prompting Hobson to tell the officer, "that's not true. He struck me. He assaulted me." Hobson moved out of Webster's house that night. The trial court again instructed the jury that the testimony was admitted only for a limited purpose: "For example, it may be considered by you on the issue of the credibility of Mary Webster. It may be considered by you in assessing the nature of the relationship between Mary Webster and Mr. Case. It should not be considered by you, for example, to say that if Mr. Case committed this act of violence, he, therefore, would commit other acts of violence, to wit, the offenses for which he is charged and, therefore, he's more likely to be guilty of those offenses or not because of testimony of this act or fight involving a fireplace poker. . . . You should not use this evidence to show that Mr. Case is likely to commit an act of violence but for the purpose for which it is relevant, that is, the credibility of Mary Webster and the nature of the relationship between Mr. Case and Mary Webster."

In ruling evidence of these altercations admissible, the trial court reasoned that the evidence showed that Webster feared defendant but also still loved him and did not want to believe he committed the charged crimes. The fact that Webster saw defendant engage in two altercations gave her reason to fear defendant, which was relevant in assessing the credibility of her testimony.

36

At the close of the guilt phase, the trial court again admonished the jury that the evidence had been "admitted to show the nature of the relationship between Charles Case and Mary Webster and to show Mary Webster's state of mind at the time she made those statements."

Defendant argues that the evidence of these altercations was unnecessary to show Webster's state of mind or the nature of her relationship with defendant, to the extent those matters were relevant, because both matters had been established by other evidence. Both matters were, however, quite relevant. Mary Webster's credibility was crucial to the prosecution's case. A main focus of the defense was that Webster was a jilted lover who committed the murders herself and framed defendant. The prosecution was justifiably concerned that the jury would wonder why Webster initially failed to notify the police and agreed to dispose of defendant's bloody clothing and hide his gun in her closet, but later reconsidered and gave the clothing to the detectives and told them what had happened. And the evidence of the violent altercations tended to support the prosecution's proffered explanation: Evidence that Webster had seen defendant commit violent acts bolstered the conclusion that Webster had reason to fear defendant. (*People v. Valencia* (2008) 43 Cal.4th 268, 302 ["Evidence of fear is relevant to the witness's credibility."].) The evidence also shows that Webster was previously willing to lie to law enforcement authorities to protect defendant. Defendant contends that he did not dispute either Webster's fear or her adoration of him. But even so, the prosecution is generally entitled to put on relevant evidence, even as to matters that are undisputed. (See *People v. Cowan* (2010) 50 Cal.4th 401, 476 ["[D]efendant's not guilty plea put in issue all of the elements of the charged offenses, including the elements he conceded. [Citations.] Thus, the prosecution was 'still entitled to prove its case . . . .' "].)

Defendant also asserts "the altercations were not probative of Webster's state of mind, as there was no evidence as to the effect that those incidents had on her thinking." It is true that the prosecution did not ask Webster what effect these particular incidents had on her, but, as defendant acknowledges, the evidence that Webster feared defendant was "plentiful." The jury could reasonably infer that her fear stemmed, at least in part, from her personal knowledge of defendant's capacity for violence.

Defendant claims this evidence was "highly inflammatory," but evidence that defendant punched Nivens in the mouth and struck Hobson on the leg with a poker pales in comparison to the circumstances of the charged crimes: the execution-style slaying of two victims during a robbery. As a general rule, when uncharged acts do not result in criminal convictions, we have recognized a heightened danger of " 'confusing the issues.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*).) But there is little chance that any juror would be moved to convict defendant for a robbery and murders he did not commit in order to punish him for his relatively minor acts of violence against Nivens and Hobson. In *Ewoldt*, we considered it unlikely "that the jury's passions were inflamed by the evidence of defendant's uncharged offenses" because "[t]he testimony describing defendant's uncharged acts . . . was . . . no more inflammatory than the testimony concerning the charged offenses." (*Ibid.*) In this case, the evidence of defendant's uncharged acts of violence was far less inflammatory than the evidence of the charged offenses.

Despite the court's repeated instructions limiting the purposes for which the jury could consider the evidence, defendant expresses concern that the jury nonetheless considered the evidence "as an indication of criminal propensity or disposition." The trial court took special pains to insure that the jury understood

its task and we presume that jurors follow the court's instructions. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 887.)

### b. *Defendant's Statements Admitting Criminal Conduct*

Defendant next argues the trial court erred in admitting evidence that defendant described himself as a bank robber, had spent time in prison, and had committed criminal activities in various forms of disguise and while using a product called Nu-Skin to mask his fingerprints. Before trial, defendant moved to exclude several of Webster's statements, including her statement that defendant told her he was an ex-convict. The trial court admitted evidence that defendant told Webster and Baker that he was an ex-convict, with "the limiting instruction that these statements made by the defendant are not offered for the truth of the matter asserted but . . . simply to show their effect on the hearer and to explain her subsequent conduct." (See Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."].)

Webster testified that defendant bragged about being a bank robber and told stories about the robberies he had committed.[3] He said he loved committing robberies and used a product called Nu-Skin to mask his fingerprints. During the time they were living together, defendant purchased a .45 caliber automatic pistol with money he borrowed from Webster. The trial court instructed the jury that

---

[3] Before Webster took the stand, Stacey and Greg Billingsley had testified that they worked with defendant at McKenry's Drapery Service, and Greg became friends with defendant. They stated, without objection, that defendant often said that he was a bank robber and that he had gone to prison. As noted above, defendant claimed the testimony of these witnesses should have been excluded as the fruit of the violation of his *Miranda* rights, but he does not otherwise challenge the admission of this evidence.

this evidence was "admitted for a limited purpose." It was "not offered for the truth of the matter asserted, and that is that Mr. Case was, in fact, a bank robber, but to explain that that is what he said and [its effect] on the person who heard it, Miss Webster. . . . The same with ex-convict; not whether he was, in fact, an ex-convict, but that that is what he said to Ms. Webster and what [effect] it had on her and how it may explain her subsequent conduct." The trial court repeated this admonition as part of its jury instructions at the close of the guilt phase, telling the jury: "The following evidence was admitted to show the nature of the relationship between Charles Case and Mary Webster and to show Mary Webster's state of mind at the time she made those statements. Mary Webster's testimony about: One, the defendant's statements to her that he was a bank robber. . . ."[4]

Defendant argues this evidence "was of scant probative value." The trial court concluded otherwise: "The fact that Mary Webster believed Charles Case when he told her that he had committed numerous other offenses . . . certainly does explain what she was doing and her motivation for doing it. . . . [S]ome of her acts are going to be somewhat difficult to swallow if you don't have this background." The trial court found that evidence that defendant had used Nu-Skin to mask his fingerprints and wigs and temporary tattoos to disguise his identity was "particularly relevant and the probative value would outweigh any prejudicial effect." The court admitted the evidence for the limited purpose of showing its effect on Webster.

---

[4] The trial court indicated that it would give a similar instruction regarding defendant's past use of Nu-Skin to mask his fingerprints, but did not do so. Defendant concedes that his failure to remind the court to give such an instruction precludes him from arguing on appeal that the court erred (*People v. Cowan*, *supra*, 50 Cal.4th at p. 480), but argues that "the fact that no limiting instruction was given is nevertheless relevant to assessing the prejudice that resulted from [the] trial court's error in admitting the evidence."

The trial court did not abuse its discretion. "The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence. [Citation.] 'The exercise of discretion is not grounds for reversal unless " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' ["][' ] [Citation.]" (*People v. Clark* (2016) 63 Cal.4th 522, 572.) We see no such error here.

### c. *Defendant's Statements Admitting Violent Conduct*

Defendant also argues the trial court erred in admitting Webster's testimony that defendant had said he had "bumped a couple people off," "knocked people off," "slapped people," and "got rid of" a getaway driver who had "snitched him off." Defendant admits that this evidence had "some relevance to Webster's fears," but argues it "was not probative enough to justify its admission." We reject the argument for reasons already given: Webster's beliefs about defendant's capacity for violence were highly significant to the question of her credibility, and the trial court did not abuse its discretion in determining under section 352 that the probative value of the statements outweighed their prejudicial effect. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 572.) We held in *Clark* that "the lack of the details from [a prior act of violence] undermined the defendant's argument that he was prejudiced." (*Ibid.*; see *People v. Edelbacher* (1989) 47 Cal.3d 983, 1028 [risk of prejudice from evidence of spousal rape was not excessive where no evidence of circumstances of the alleged rape had been admitted].) The trial court did not abuse its discretion in concluding that any prejudice from defendant's general statements that he had "bumped a couple of people off" was outweighed by its probative value.

41

### d. *Webster's Interview*

Defendant next contends the trial court erred by admitting into evidence portions of Webster's interview with Detectives Reed and Edwards.  Detectives Reed and Edwards made an audio recording of their interview of Mary Webster the day after the murders.  The transcription of the interview was 40 pages.  Defendant objected to playing for the jury certain portions of the recording and the court sustained some, but not all of defendant's objections, resulting in the deletion of nearly two pages of the transcription.

The recording demonstrated that Webster found it difficult to believe that defendant had lied to her and had committed the charged crimes.  Defendant concedes that "[e]vidence of Webster's resistance to the idea that appellant was responsible for the murders at The Office was relevant to the extent it tended to show that she was not attempting to frame him," but argues that Webster's incredulity was established by portions of the recording to which defendant did not object.

Defendant argues, however, that certain portions of the recording were "inflammatory and highly prejudicial."  Specifically, defendant renews his trial objection to a portion of the recording in which the detectives assert that defendant was lying to Webster when he claimed to have shot two men over a poker game.  When the detectives told Webster that defendant had committed the crimes at The Office, she asked:  "Why would he tell me this other story?"  Detective Edwards responded:  "He wanted to get—boast the fact that he killed somebody, but didn't want to tell you the facts so you could put two and two together.  But, you're a smart enough woman that you started putting things together even though he lied to you."  The trial court overruled defendant's objection to this portion of the recording, explaining:  "I don't see that there is that much, if any, prejudice from those lines. . . .  I think it definitely shows the efforts of the detectives to convince

42

Mary Webster to cooperate, and it provides a good look at her state of mind at that time, which was an unwillingness to believe and an unwillingness to cooperate."

Defendant also asserts he was prejudiced by a similar portion of the recording to which he did not object at trial. In response to Webster's statement that defendant told her the victims were Black, Detective Reed said: "Okay. Well, he's lying to you, Mary." Detective Edwards added: "He's lying about certain things, because he doesn't want you to try and put things together. But, you're a smart enough woman that you can."

Defendant did object to a later statement by Detective Reed. In response to Webster's statement, "I hate a liar," Detective Reed said: "Well, he lied to you. That's for (Unintelligible)." The trial court overruled the objection: "I think it shows the efforts [the detectives] went through and it shows her state of mind as well because the previous line, Mary Webster says quote, 'Shit. I hate a liar' close quote. . . . I think it also shows at some point, she begins to come around. And this may be where it begins."

Defendant objected to Detective Edwards's speculation about defendant's reason for lying to her: "What reason? Probably to cover up a little bit? Probably hopefully that you wouldn't put the one out in Rancho Cordova with the one in Del Paso. . . . And he could look like a big man and—and throw fear into you . . . ." In overruling defendant's objection, the trial court referred to its earlier grant of defendant's request "to instruct the jury as to the limited basis for the receipt of certain of the evidence contained herein. Namely, [that] the information that is imparted to Mary Webster by the police officers during the course of this interview . . . is not being offered for the truth of the matter asserted in it but merely to show the effect that it had on Mary Webster at that time." The trial court stated: "I think the cautionary instruction will cover this as well, that the officers are expressing certain theories of the case which they believe or may not

43

believe. . . . I think they'll see that the primary purpose of what the officers are saying here is to get her to cooperate . . . and whether the things they say turn out to be true or not is really secondary. It does show a continued resistance here."

Although he did not object in the trial court, defendant claims he was prejudiced by Detective Reed's statement that the theory that defendant committed the charged crimes is "what it looks like to us." Defendant did object to Detective Edwards's assertion a short time later that defendant "killed two people, Mary. . . . He killed two people. Let us look at the gun and prove that." The trial court admitted these statements, holding: "She's reluctant to give up the gun because she's afraid and she doesn't want to believe it and they are countering with he killed two people. Give us this evidence. It's the moral dilemma that she faces, really, she has information and evidence which could link her former boyfriend to the death of these two individuals. And, yet, she still doesn't want to give evidence against him."

Defendant objected to admitting the following exchange:

"WEBSTER: . . . Why does it have to be Casey? Why?

"EDWARDS: Because he did it, that's why."

Defense counsel argued "that it's just a continued expression on the part of the officers, their belief that Mr. Case is the guilty party. And that's been repeated over and over and over again throughout this interview." The prosecutor responded: "And Mary Webster has resisted over and over again, and that's why it's significant." The court admitted the evidence.

The trial court overruled defendant's objections to Detective Reed's statement that he was "convinced [defendant]'s the one that did this" and to the detective's reiteration that defendant committed the charged crimes.

Defendant objected to Detective Reed's explanation of why "it all fits" that defendant committed the charged crimes: "The caliber of the weapon, number

44

one.  All the blood on his boots.  I can't go into great detail about the scene, but . . . it all just fits."  Detective Reed observed that the crimes were committed around 8:30 to 9:30 p.m. and Webster added that defendant "was at my place at 10:00."  The trial court admitted the evidence, ruling that it "shows the resistance . . . that was offered by Mary Webster, that is, her strong desire not to believe that what the officers were saying was true and her desire not to cooperate with them."  Detective Reed later repeated, without objection, "that all this fits."  Detective Reed added, without objection:  "We don't know why he did it, except robbery maybe."

Defendant objected to the detectives looking at photographs of the crime scene with Webster and speculating on how the crimes were committed and how defendant might have gotten blood on his boots.  The trial court overruled the objection, observing:  "Well, what I see here is still, she doesn't believe it."  The court concluded the detectives were "confirming with the evidence over and over again to try to get her to cooperate."

Although he did not object at trial, defendant argues he was prejudiced by Detective Edwards's statement that defendant had been "[b]oastin' about doing two people" and his suggestion that defendant might "come for" Webster if defendant remained at large.

Before the recording was played for the jury, the court gave the following instruction:  "During the interview, Detective Edwards and Detective Reed will tell Mary Webster certain facts about the investigation.  You should keep in mind at all times that the jury determines what the facts are.  And that at the time that this interview was conducted . . . the investigation was nowhere near complete.  Second, the purpose of this interview was to persuade Mary Webster to cooperate with law enforcement.  And, for that reason, the detectives are permitted to shade the facts, if that is necessary, in their judgment to persuade the individual . . . to

45

cooperate. So you should not believe that Detective Reed or Detective Edwards at that time had any special knowledge of what the truth is in as far as this case was concerned. . . . And, finally, this tape and the statements of Mary Webster are not offered for the truth of the matter asserted . . . but to explain and demonstrate for you Mary Webster's state of mind at the time the interview was conducted."

Defendant argues the trial court abused its discretion under section 352 by admitting into evidence these portions of the interview because they were more prejudicial than probative. The trial court carefully reviewed the evidence and reasonably concluded that they had substantial probative value. Mary Webster was a key prosecution witness and defendant's primary defense was that she was lying and actually committed the crimes herself, so her credibility during the interview the day after the crimes was crucial. As the trial court observed, the fact that the detectives had to repeatedly attempt to convince Webster that defendant had committed the offenses was highly relevant to Webster's credibility. And the fact that the detectives expressed their belief that defendant had committed the crimes was not unduly prejudicial because the court carefully instructed the jurors they were not to consider this evidence for its truth, but only to demonstrate Webster's state of mind. Contrary to defendant's unsupported contention, we will presume the jury followed the court's instruction. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.)

### 2. *Evidence of Soliciting Others to Commit Crimes*

Over defendant's objection, Greg Billingsley and Billy Joe Gentry, who both worked with defendant at McKenry's Drapery Service, testified that defendant asked them to help him commit robberies shortly before the charged robbery-murders were committed. Defendant argues this evidence was inadmissible under Evidence Code section 1101, subdivision (b), and the trial

46

court abused its discretion under section 352 because the evidence "was far more prejudicial than probative." This error, defendant claims, violated his right to a fair trial under the due process clause of the Fourteenth Amendment to the United States Constitution.

Gentry testified that on Halloween of 1992, about eight months before the charged crimes, defendant asked him if he wanted "to earn extra money being a driver in a hold-up." Defendant said that Gentry would "be driving and pull up and he'd go out and do all the work and come back in and [Gentry would] just drive away." Gentry declined, explaining that he had a wife and children "and if anything happens, I couldn't take care of them again."

Greg Billingsley testified he was in a bowling league with defendant. The same year the crimes were committed, defendant asked him if he "wanted to do a job with him. Said all I'd have to do is drive, and that he was going to rob the lady" from the bowling alley on her way to make a bank deposit. Billingsley declined, saying, "[N]o, that's not for me."

The trial court ruled this evidence was admissible as evidence that defendant had planned the robbery at The Office: "This robbery of The Office was apparently not the result of a sudden impulse, but was the result of planning engaged in by the defendant, a great deal of deliberation. And while the target of the robbery, The Office may be something that was decided on the spur of the moment, the idea of doing a robbery, it appears it's something that was present in Mr. Case's mind for a long time." The court continued: "[The incidents] are also admissible to show that this is a design or plan that the defendant had begun to think about early on . . . ." The court ruled that, under section 352, the probative value of the evidence "outweighs any possible prejudice that might be drawn from it." The court, however, granted defendant's request for limiting instructions. The court instructed the jury: "This evidence is not admitted to establish that

47

defendant has a criminal disposition or bad character, and you are not to consider it for that purpose. You may consider it on the issue of whether the defendant committed the charged offenses pursuant to an evolving or continuing scheme or plan, referred to in his comments to Billingsley and Gentry relating to those uncharged acts."

Defendant argues that the admission of this evidence violated Evidence Code section 1101. Subdivision (a) of section 1101 generally prohibits admission of "evidence of a person's character or a trait of his or her character . . . to prove his or her conduct on a specified occasion." Subdivision (b) clarifies that subdivision (a) does not prohibit "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, preparation, plan . . .) other than his or her disposition to commit such an act."

It long has been established that evidence that a defendant was planning to commit a crime is admissible to prove that the defendant later committed that crime: "The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done. A plan is not always carried out, but it is more or less likely to be carried out. . . . There is no question about the relevancy in general of such evidence . . . ." (1A Wigmore, Evidence (Tillers rev. ed. 1983) § 102, p. 1666.) "There is no situation in which a design to do an act would be irrelevant to show the doing of the act." (*Id.*, § 104, p. 1668, fn. omitted.) "Evidence that the defendant possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense." (*People v. Balcom* (1994) 7 Cal.4th 414, 424.)

Defendant argues that the evidence that he had solicited Billingsley and Gentry to assist him in committing robberies was inadmissible because those

48

proposed robberies had no connection to the charged crime. The trial court took a different view, concluding that the evidence was relevant to show that defendant planned to commit robbery, and that the jury could reasonably have concluded that defendant followed through on that plan by committing the robbery at The Office. "We review the trial court's determination for an abuse of discretion, examining the evidence in the light most favorable to the court's ruling. [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 120.) The trial court did not abuse its discretion.

The court noted that although the robbery at The Office, in particular, may have been "decided on the spur of the moment, the idea of doing a robbery, it appears it's something that was present in Mr. Case's mind for a long time." Defendant's solicitation of Gentry supports the trial court's view. Defendant did not solicit Gentry to assist in a robbery of a specific victim at a particular time and place, but asked in general terms whether he wanted "to earn extra money being a driver in a hold-up." Defendant's solicitation of Billingsley was more specific, involving a different target. But in combination with the evidence of defendant's solicitation of Gentry, it supports the trial court's view that defendant was not specifically focused on the robbery of a particular target, but was instead planning to commit a robbery when the opportunity to do so presented itself. As the Attorney General notes, the robbery at The Office was consistent with the general plan revealed by the solicitations: defendant evidently planned to commit a robbery at a business establishment with which he was familiar, with defendant alone committing the actual robbery.

Defendant argues that the "solicitations [of Billingsley and Gentry] were not similar enough to the charged crimes to be admissible" to show that defendant planned to commit the charged robbery because the proposed crimes "were not similar in terms of location, victim, plan or method of perpetration." For this argument, defendant relies on a discussion in *Ewoldt*, *supra*, 7 Cal.4th at page 393,

concerning when the circumstances of prior, uncharged misconduct are sufficiently similar to the charged offense to "support[] the inference that defendant committed the charged offenses pursuant to the same design or plan defendant used to commit the uncharged misconduct." But here, the evidence was not admitted to demonstrate that defendant employed a common design or plan that united various instances of uncharged and charged misconduct, but instead to show that defendant had formed a general plan—to be carried out in the future—to commit robbery. At least in the case of the solicitation of Gentry, it would be impossible to evaluate the degree of similarity in the way *Ewoldt* holds is required of an already completed act, because the evidence shows only that defendant was planning to commit a robbery (preferably with the help of a partner); the evidence otherwise sheds no light on defendant's proposed location, victim, or plan or method of perpetration. The trial court reasonably concluded that the existence of this general plan to commit robbery was relevant to the jury's consideration of whether defendant committed the charged robbery of The Office.

Nothing in *Ewoldt* calls into question the well-established rule that direct evidence that a defendant had planned to commit a crime (as opposed to circumstantial evidence that the defendant committed similar uncharged offenses) is admissible to prove that the defendant later committed that crime. On the contrary, *Ewoldt* affirms the relevance of direct evidence that a defendant planned to commit a particular crime: "For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, citing *People v. Nicolaus* (1991) 54 Cal.3d 551; see also *People v. Smith* (2005) 35 Cal.4th 334, 359 [newspaper articles in the defendant's home depicting similar offenses "were relevant . . . as evidence that defendant was planning, or at least contemplating, such a crime"].) We are not convinced that, as

50

defendant argues, "[t]he only logical inference that the jury could have drawn" from this evidence was that defendant "had a propensity to commit robbery." As noted, the evidence permitted the jury to draw the quite different inference that defendant committed the same crime as the one he had planned to commit. The trial court correctly instructed the jury that this evidence was "not admitted to establish that defendant has a criminal disposition or bad character, and you are not to consider it for that purpose." We presume that jurors follow the court's instructions. (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 887.)

Nor are we persuaded by defendant's argument that the evidence was unduly prejudicial. We noted in *Ewoldt* that "[e]vidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) Evidence of uncharged crimes is particularly prejudicial if "defendant's uncharged acts did not result in criminal convictions" because "the jury might have been inclined to punish defendant for the uncharged offenses . . . ." (*Id.* at p. 405.) The danger of undue prejudice is, however, lessened if evidence of the uncharged acts was "no more inflammatory than the testimony concerning the charged offenses." (*Ibid.*)

The evidence at issue here does not present comparable dangers. There is nothing in this case to indicate that defendant would be unduly prejudiced by the evidence that he solicited Billingsley and Gentry to assist him in committing robbery. It is unlikely that any reasonable juror would be inclined to punish defendant for these solicitations by convicting him of a double robbery-murder, and evidence that defendant tried to enlist his friends to help him commit robbery was far less inflammatory than the evidence of the violent crimes with which defendant was charged. The trial court did not abuse its discretion in admitting this evidence.

51

### 3. Admission of Defendant's Statements at Law Enforcement Meetings

Over defendant's objection, Sergeant Theodore Voudouris of the Sacramento County Sheriff's Department testified that early in 1993, he arranged for defendant to be a guest speaker at "a meeting of law enforcement professionals." During the meeting, defendant was asked what he would do if he "met with resistance during a robbery." According to Voudouris, defendant responded that he "would take somebody out."

Brian Curley, who then worked for Bank of America, also attended that meeting. Curley recalled that defendant was asked what he would do if he were committing a robbery and someone resisted. According to Curley, defendant answered "that he would blow the person away."

The trial court instructed the jury that it could consider this evidence "regarding defendant's mental state or intent or premeditation and deliberation," but not "to show defendant's bad character or disposition to commit crime." (See Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."].)

Defendant argues that the trial court erred in admitting this evidence because it "bore no logical relevance to any material fact in dispute at appellant's trial" and any probative value it had was "far outweighed" by its prejudicial effect. In admitting the evidence, the trial court found it was relevant to show defendant's state of mind, terming it a "statement[] of intent . . . reflecting intent to kill a particular category of victims in specific circumstances."

In *People v. Rodriguez* (1986) 42 Cal.3d 730, 756–757, we held that prior statements by a defendant charged with the murder of two Highway Patrol Officers "that he would kill any officer who attempted to arrest him" "tended to show a design or intent to kill members of a class of persons under certain

circumstances." "Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat." (*Id.* at p. 757.) We applied this holding in *People v. Karis* (1988) 46 Cal.3d 612 (*Karis*). The defendant in that case was convicted of kidnapping two women, raping one of them, and then murdering one of the women and attempting to murder the other. (*Id.* at p. 621.) The surviving victim testified the defendant told her he had to kill the women "so that he would not be killed." (*Id.* at p. 623.) The defendant asserted that the trial court erred in admitting evidence that a few days before the murders, the defendant told an acquaintance "that he would not hesitate to eliminate witnesses if he committed a crime." (*Id.* at p. 634.) Relying on our decision in *Rodriguez*, *supra*, 42 Cal.3d 730, we held that the trial court did not err because the defendant's statement "regarding his intent, while not directed toward a specific victim, did contemplate the action he would take in circumstances much like those which preceded the murder of" one victim, and the attempted murder of another. (*Karis*, *supra*, at pp. 637–638; see also *People v. Lang* (1989) 49 Cal.3d 991, 1013 [ruling admissible the defendant's statement that he would " 'waste any mother fucker that screws with [him]' "].)

Defendant contends his statement explained only what he would have done in the past and not what he might do in the future. The statement is, however, susceptible of either interpretation, and ultimately its significance was a matter for the jury to determine. A reasonable juror could conclude that it indicated what defendant would do if presented with such circumstances in the future.

Defendant also argues that his statement was inadmissible because he said he would kill a robbery victim who resisted and there is no evidence the robbery victims in this case resisted. Evidence that defendant expressed a willingness to kill a robbery victim who resisted is highly relevant to show that defendant contemplated the killing of a robbery victim, whether or not there is evidence to

show that the victims in this case resisted.  And the fact that defendant had committed the crimes he described 15 years earlier did not make the statement less relevant; defendant described his willingness to kill a robbery victim only a few months before the charged crimes were committed.

Defendant asserts that the "enormous" prejudicial effect of this evidence outweighed any probative value because "[i]t is difficult to imagine anything more inflammatory in a prosecution for robbery-murder than evidence that the defendant was invited by a body of law enforcement officers to address them in the manner of an expert in committing robberies, and then told those officers that when committing a robbery, he would have killed anyone who resisted."  But "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*Karis*, *supra*, 46 Cal.3d at p. 638.)  For purposes of section 352, " 'prejudicial' means uniquely inflammatory without regard to relevance." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1138.)  The statute uses the term "prejudicial" "in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors.  [Citation.]" (*People v. Farmer* (1989) 47 Cal.3d 888, 912.)  " 'Evidence is substantially more prejudicial than probative [citation] if . . . it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].'  [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.)  As the trial court correctly found, the statements defendant made at the meeting of law enforcement professionals were relevant "regarding defendant's mental state or intent or premeditation and deliberation" and were not unduly prejudicial.  The evidence did not invite the jury to decide whether defendant was guilty of the charged crimes based on extraneous factors.

#### 4. *Exclusion of Evidence That the Police Investigation Was Incomplete*

Defendant contends the trial court committed state law evidentiary error and violated his state and federal constitutional rights by sustaining the prosecutor's objections to three questions defense counsel posed to Detective Reed.

As noted, Steven Langford testified that after defendant arrived at Webster's house on the night of the murders, defendant asked Webster to retrieve his gun from the car defendant had driven and Webster did so. Langford acknowledged, however, that he had told the prosecutor and a prosecution investigator before trial that he had retrieved defendant's gun from the car defendant had driven.

Defense counsel called Detective Reed as a witness. Detective Reed testified that when he first interviewed Langford before trial, Langford said that defendant had the gun with him when he arrived at the house. Langford never told Detective Reed that Langford had retrieved the gun from the car. Detective Reed agreed that "this would have been important" because it "absolutely" would be important for him to know who handled the gun.

Defense counsel then asked Detective Reed, "were you ever made aware of this by anyone prior to court?" The court sustained the prosecutor's objection that this question was irrelevant, despite defense counsel's explanation that "[i]t goes to his investigation and whether or not it's a complete investigation of this case, your Honor, as to whether or not he ever had any knowledge that there's more than one story about who got the gun." On the same grounds of relevancy, the court sustained objections to defense counsel's follow-up questions: "So you never knew that Mr. Langford had made a statement that he had obtained that gun from the car . . . is that right?" and "Did you know that Mr. Langford also indicated that Mr. Case had changed his clothes at Mary Webster's house, changed

55

into a new set of clothing there?" The court explained: "Well, you're asking this particular detective what he considers to be important insofar as the investigation is concerned. That's really irrelevant to what the jury considers important . . . . This case has to be decided on what was done and what evidence has been presented. If there are inconsistencies in that evidence or there are gaps in that evidence, then that's the state of the evidence and that's the facts upon which the jury must rely in reaching their decision."

Defendant argues on appeal that "the excluded examination was relevant because defense counsel's questions were designed to impeach Reed's credibility by showing the inadequacy of his investigative work and thus to establish that the flawed investigation raised a reasonable doubt about appellant's guilt." The argument that the question was relevant to impeach Detective Reed's credibility was not raised in the trial court and cannot be raised for the first time on appeal. " '[T]o preserve an alleged error for appeal an offer of proof must inform the trial court of the "purpose, and relevance of the excluded evidence . . . ." [Citation.] This is in accord with "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal.*" [Citation.]' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 108.) "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless . . . [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court . . . ." (Evid. Code, § 354.) In any event, the argument fails on its merits.

Standing alone, the fact that Detective Reed had not been given certain information was irrelevant because it did not have a tendency to show that his investigative work was flawed or the investigation was inadequate. (Evid. Code,

56

§ 210.) Detective Reed testified that Langford never told him that Langford had retrieved the gun from the car defendant was driving, and such information "absolutely" would be important for him to know. Defendant does not explain the relevance of showing that no one else told Detective Reed that Langford had made this statement, or that Langford had said that defendant had changed his clothes at Mary Webster's house. Defendant says that "[d]emonstrating that Reed did not know about the inconsistencies between Langford's and Webster's testimony was important to appellant's defense that Webster framed appellant," but does not explain why that is so. (See *People v. Page* (2008) 44 Cal.4th 1, 37 [evidence "that the police focused more attention upon defendant than upon other men whose conduct was brought to their attention" and "may have chosen not to follow up more thoroughly on all leads" was properly excluded as irrelevant because it did "not impeach the evidence against defendant" and had "no tendency to establish any relevant fact . . . ."]; *People v. Valdez, supra*, 32 Cal.4th at p. 109 [the probative value of a "general attack on the police investigation" was "minimal"]; *People v. Cooper* (1991) 53 Cal.3d 771, 820 ["The competency of the investigation . . . was only tangentially relevant to the issue of guilt . . . ."].)

### 5. *Admitting Defendant's Out-of-Court Statement on Rebuttal*

As noted, the prosecutor did not proffer defendant's out-of-court statement in his case-in-chief. On rebuttal, however, the prosecutor introduced portions of defendant's pretrial statement in which defendant acknowledged having seen on a television news broadcast that a homicide had occurred at The Office the night before. He also admitted he had driven to The Office that night in Jerri Baker's Ford Probe and was there when the bar closed. Defendant added that he could not explain the clothing the detectives had gotten from Mary Webster and had "no idea" whether the blood on the clothing was going "to match the people over there

57

in The Office bar." He admitted the clothes were his and explained that he had gotten blood on them while shaving.

Defendant argues that the trial court abused its discretion and violated his due process right to fundamental fairness under the California and federal Constitutions by admitting this evidence. He claims he was "sandbagg[ed]" and the prosecutor "engaged in unfair gamesmanship" by putting the evidence on during rebuttal, rather than during the prosecution's case-in-chief.

Defendant acknowledges that "[t]he scope of rebuttal evidence is generally within the trial court's discretion." "The order of proof rests largely in the sound discretion of the trial court, and the fact that the evidence in question might have tended to support the prosecution's case-in-chief does not make it improper rebuttal. [Citations.] It is improper for the prosecution to deliberately withhold evidence that is appropriately part of its case-in-chief, in order to offer it after the defense rests its case and thus perhaps surprise the defense or unduly magnify the importance of the evidence. Nevertheless, when the evidence in question meets the requirements for impeachment it may be admitted on rebuttal to meet the evidence on a point the defense has put into dispute." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 68; see *People v. Mayfield* (1997) 14 Cal.4th 668, 762 ["The trial court did not abuse its discretion when it permitted the prosecution to use [an out-of-court] statement in rebuttal, even though it was known to the prosecution before trial and could have been used during the prosecution's case-in-chief."].) " 'As with all relevant evidence, . . . the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a

manifest miscarriage of justice.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

Defendant argues that his pretrial statements "did not actually rebut any evidence presented by the defense," but the portions of defendant's pretrial statement that the prosecutor introduced on rebuttal served to bolster the credibility of several prosecution witnesses after defendant introduced evidence that tended, without great effect, to call into question the credibility of these witnesses. In particular, Tracy Grimes testified in the prosecution's case-in-chief that he went to The Office about 8:30 p.m. on June 20, 1993, and saw defendant there. Defendant asserts that he did not challenge the accuracy of Grimes's identification, but that claim is not supported by the record. On cross-examination, defense counsel asked Grimes how he knew what time he arrived at The Office. He asked what had brought defendant to Grimes's attention, how far away defendant was, and what the lighting was like. Defense counsel questioned Grimes at length about what defendant had been wearing and whether he had made inconsistent statements about defendant's shirt and boots. Tony Gane later testified that he interviewed Grimes and related Grimes's description of defendant's clothing. Defendant argues that Grimes's testimony about defendant's clothing "was relevant to the defense theory that the blood had been planted on the clothes and boots in evidence." But this evidence also was relevant to question the accuracy of Grimes's identification of defendant. Defendant's pretrial statement that he had been at The Office on the night of the murders until "five minutes before nine o'clock" tended to support the testimony of Grimes that he saw defendant there and to rebut defendant's attack on Grimes's credibility.

The trial court recognized that it was less clear whether defendant's statements about being in The Office earlier that evening with Susan Burlingame properly were admitted on rebuttal, but the trial court exercised its discretion to

admit the evidence "because it does tend to give more meaning to the testimony of Grimes." The trial court did not abuse its discretion. The details of defendant's description of when and with whom he visited The Office tended to support Grimes's testimony that he saw defendant there shortly before the murders. In any event, the admission of these statements could not have prejudiced defendant as they did no more than confirm these portions of Burlingame's testimony.

In its case-in-chief, the prosecution introduced evidence that Mary Webster gave a sheriff's deputy a shirt and pair of boots that had human blood on them, explaining that defendant had worn these clothes on the night of the murders. Peter Barnett, a criminalist, testified for the defense that he did not believe the blood on the clothing "resulted from the shooting itself" and said it was possible that someone took the shirt and boots into the crime scene and deliberately put blood on them. Defendant's pretrial statement that the clothing was his and he got blood on them while shaving supported Webster's testimony and rebutted in part Barnett's testimony.

Mary Webster also testified in the prosecution's case-in-chief that defendant had come to her house on the night of the murders. Defendant's statement that he went to Mary Webster's house from The Office served to rebut defendant's attack on Webster's credibility.

Greg Nivens, Mary Webster's adult son, testified in the prosecution's case-in-chief that about 11:00 a.m. on the day defendant was arrested, June 21, 1993, defendant was sitting on the couch in Webster's home watching television. Asked what defendant was watching, Nivens replied, "I think it was the news." The defense called investigator Tony Gane to testify that the television listing in the Sacramento Bee newspaper showed there were no local news broadcasts between 9:00 a.m. and noon on that date. Defendant argues that his pretrial statement that he had seen something about the homicides at The Office on television that

60

morning was not inconsistent with Gane's testimony because defendant could have watched the news earlier that morning. While that is true, defendant's statement that he had seen something about the homicides on television that morning tended to support Nivens's statement that defendant had watched the news in Webster's home that morning.

Anita Dickinson lived in a trailer behind The Office and testified that she saw an unfamiliar car in the parking lot of The Office on the night of the murders. She described it as a small car and said she was "not too sure of the color." That vehicle was not there following the murders. Shown a photograph of Jerri Baker's Ford Probe, Dickinson could not say whether it was the vehicle she had seen, but said it looked similar. On cross-examination, Dickinson said the unfamiliar car was a "silverish, bluish, light color," but she could not be sure "of the exact colors." She was "pretty sure it was a two door" and could have been half the size of the Camaro it was parked next to.

Investigator Tony Gane testified for the defense that Jerri Baker's Ford Probe was taller than a Camaro and nearly as long. Deputy Sheriff Elizabeth Sawyer testified for the defense that she interviewed Dickinson on the night of the murders and she said she had not noticed any unfamiliar vehicles. Defendant's pretrial statement that he drove Jerri Baker's Ford Probe to The Office and parked in the parking lot near a Camaro supported the credibility of Dickinson's testimony. Defendant's argument that Dickinson could not have been referring to Baker's car because it was far larger and a different color than the vehicle Dickinson described is not persuasive. Dickinson said she could not be sure of the color or the size. Defendant's statement confirmed Dickinson's testimony that an unfamiliar car was parked in the parking lot next to the Camaro.

While acknowledging the trial court's broad discretion to control the order of proof, "[t]his court has criticized the tactic of waiting for cross-examination or

61

rebuttal to use important evidence.  If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be. [Citations.]  [¶]  The purpose of this restriction 'is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence.  Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime.  It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.]' " (*People v. Thompson* (1980) 27 Cal.3d 303, 330 (*Thompson*).) Similarly, in *People v. Daniels* (1991) 52 Cal.3d 815, 860 (*Daniels*), we made clear that evidence that is "obviously central to the criminal prosecution . . . should be proved as part of the prosecution case-in-chief."

But in both *Thompson* and *Daniels*, the prosecution had waited until cross-examination or rebuttal to introduce evidence that the defendant had confessed. (*Thompson*, *supra*, 27 Cal.3d at p. 331 ["the prosecutor sought to introduce on cross-examination a limited portion of appellant's confession"]; *Daniels*, *supra*, 52 Cal.3d at p. 860 ["defendant's statement . . . amounted to an acknowledgment of guilt"].)  Stating the obvious, we held in *Thompson*:  "Clearly, a purported confession by an accused to any crimes that are charged 'tends to establish the defendant's commission of the crime.' " (*Thompson*, at p. 330.)

The evidence at issue in this case is not of the same character.  Defendant did not confess; in his statement to the officers, defendant adamantly denied having killed the victims.  He admitted having been present at The Office that

evening. In its case-in-chief, the prosecution chose to use the testimony of two eyewitnesses, Susan Burlingame and Tracy Grimes, to establish that fact. The trial court did not abuse its discretion in concluding that it was reasonable for the prosecutor to introduce defendant's pretrial statement on rebuttal only after the defense introduced evidence that tended to attack the credibility of several prosecution witnesses.

### C. Penalty Phase Issues

#### 1. Challenges to the Death Penalty Statutes

In order to preserve these issues, defendant briefly raises a number of challenges to the California death penalty statutes that he acknowledges this court previously has considered and rejected. We briefly respond to each of these challenges below.

The death penalty statutes are not unconstitutional for failing to meaningfully narrow the class of murderers eligible for the death penalty. (*People v. Simon* (2016) 1 Cal.5th 98, 149 (*Simon*).)

"Section 190.3, factor (a), which permits the jury to consider the circumstances of a defendant's crime in determining whether to impose the death penalty, does not license the jury to impose death in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. [Citations.]" (*Simon*, *supra*, 1 Cal.5th at p. 149.)

The death penalty statutes are not unconstitutional for failing to require "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235) or that aggravating factors " 'outweigh the mitigating factors, and render death the appropriate punishment.' [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 149). Nor is the jury required to find unanimously

63

and beyond a reasonable doubt that aggravating factors outweigh mitigating factors. (*People v. Jones* (2017) 3 Cal.5th 583, 618–619 (*Jones*).) This conclusion is not altered by the decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616] (*Hurst*). (*Jones*, *supra*, 3 Cal.5th at p. 619.)

The federal Constitution does not require that a burden of proof be placed on the prosecution at the penalty phase. (*People v. Jackson* (2016) 1 Cal.5th 269, 372 (*Jackson*).) Nor did the trial court err by failing to tell the jury that there was no burden of proof. (*Id.* at p. 373.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79.)

The federal Constitution does not require that the jury agree unanimously on which aggravating factors apply. (*Jackson*, *supra*, 1 Cal.5th at p. 372.) This does not violate a capital defendant's right to equal protection of the laws. "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law [citation] . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.) Nor does the federal Constitution require that the jury agree unanimously on whether defendant committed unadjudicated criminal activity. (*Simon*, *supra*, 1 Cal.5th at p. 150; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 452.)

The phrase " 'so substantial' " in CALJIC No. 8.88 is not unconstitutionally vague and "the instruction is not unconstitutional for not stating that the central determination is whether the death penalty is 'appropriate.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 533.)

The trial court did not violate the Eighth and Fourteenth Amendments to the federal Constitution by instructing the jury that it could return a judgment of death if "the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." "The instruction properly explains to the jury that it may return a death verdict if the aggravating evidence 'warrants' death." (*People v. McDowell* (2012) 54 Cal.4th 395, 444.)

The federal Constitution does not require the trial court to instruct the jury that it must return a sentence of life without parole if it determines that the factors in mitigation outweigh the aggravating factors. (*Jackson*, *supra*, 1 Cal.5th at p. 373.)

The trial court is not required to instruct the jury that it need not agree unanimously on whether mitigating factors apply. (*People v. Breaux* (1991) 1 Cal.4th 281, 314–315.)

"We have repeatedly held that ' "[t]he trial court's failure to [instruct] the jury that there is a presumption of life does not violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution." ' [Citations.]" (*People v. Cage* (2015) 62 Cal.4th 256, 293–294.)

The jury is not required by the federal Constitution to make written findings at the penalty phase. (*Simon*, *supra*, 1 Cal.5th at p. 149.) This conclusion is not altered by the high court's decision in *Hurst*, *supra*, 577 U.S. ___ [136 S.Ct. 616]. (*Jones*, *supra*, 3 Cal.5th at pp. 618–619.)

"The use of adjectives such as 'extreme' and 'substantial' in the list of potential mitigating factors in section 190.3 does not unconstitutionally obstruct the jury's ability to consider mitigating evidence." (*Simon*, *supra*, 1 Cal.5th at

65

p. 150.) And the trial court was not required to delete from the jury instructions sentencing factors that do not apply or "advise the jury which sentencing factors were aggravating, which were mitigating, or which could be either aggravating or mitigating depending on the jury's appraisal of the evidence." (*Jones*, *supra*, 3 Cal.5th at p. 620.)

The federal Constitution does not require intercase proportionality review. (*Jones*, *supra*, 3 Cal.5th at p. 620.)

"California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants." (*Simon*, *supra*, 1 Cal.5th at p. 150.)

"International norms and treaties do not render the death penalty unconstitutional as applied in this state." (*Simon*, *supra*, 1 Cal.5th at p. 150.)

### 2. Cumulative Error

Defendant contends that the cumulative effect of errors at the guilt and penalty phases requires reversal of the judgment of conviction and sentence of death. This claim fails, as we have found only one error—the admission of defendant's pretrial statement in violation of *Miranda*—and have determined that this sole error was harmless. (*People v. Melendez* (2016) 2 Cal.5th 1, 33.)

### 3. Restitution Fine

At the time defendant committed his crimes, Government Code former section 13967, subdivision (a), required the trial court to order a defendant who was convicted of a felony offense to pay to the Restitution Fund in the State Treasury a "restitution fine of not less than two hundred dollars ($200), subject to the defendant's ability to pay, and not more than ten thousand dollars ($10,000)." (Stats. 1992, ch. 682, § 4, p. 2922.) Subdivision (c) of the statute further required the court to order the defendant to pay restitution directly to a victim who had

66

"suffered economic loss . . . in lieu of imposing all or a portion of the restitution fine." (*Id.* at p. 2923.)[5] The trial court in this case ordered a restitution fine of $10,000 and direct victim restitution of $4,000.

Defendant argues that the restitution fine must be vacated because the record contains insufficient evidence of his ability to pay for purposes of former section 13967. He also argues that the amount of the fine must be reduced by the amount of restitution defendant was ordered to pay in direct victim restitution. The Attorney General asserts that defendant has forfeited this claim by failing to object at his sentencing hearing and the restitution fine is lawful because the record supports an implied finding that the trial court determined defendant was able to pay the fine. The Attorney General concedes, however, that the amount of the restitution fine must be reduced by the amount defendant was ordered to pay in direct victim restitution.

---

[5] At the time defendant committed his crimes, Government Code former section 13967 provided, in pertinent part: "(a) Upon a person being convicted of any crime . . . , the court shall . . . order the defendant to pay restitution . . . . In addition, if the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than two hundred dollars ($200), subject to the defendant's ability to pay, and not more than ten thousand dollars ($10,000). . . . [¶] (b) Except as provided in subdivision (c), the fine imposed pursuant to this section shall be deposited in the Restitution Fund in the State Treasury. . . . [¶] (c) In cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, in lieu of imposing all or a portion of the restitution fine, the court shall order restitution to be paid to the victim. . . ." (Stats. 1992, ch. 682, § 4, pp. 2922–2923.) This provision was repealed in 1994, before the trial and sentencing in this case. The question of restitution is now governed solely by Penal Code section 1202.4, "which provides detailed guidance to the trial court in setting a restitution fine, including consideration of a defendant's ability to pay." (*People v. Vieira* (2005) 35 Cal.4th 264, 305.)

67

We considered a similar challenge in *People v. Gamache* (2010) 48 Cal.4th 347. The defendant in that case, like defendant here, committed his crime in late 1992, when Government Code former section 13967, subdivision (a), was in effect, and was sentenced in 1996, after that provision was repealed. Defendant in that case, like defendant in this case, argued that his $10,000 restitution fine should be vacated because the record contained no evidence concerning his present ability to pay or that he would have the ability to pay in the future after being sent to death row. We held that the defendant forfeited the argument by failing to raise it at his sentencing hearing, explaining: "[T]he law at the time of both his 1992 crime and 1996 sentencing called for the trial court to consider his ability to pay in setting a restitution fine, and [the defendant] could have objected at the time if he believed inadequate consideration was being given to this factor. (See Gov. Code, former § 13967, subd. (a), as amended by Stats. 1992, ch. 682, § 4, p. 2922 [restitution fine 'subject to the defendant's ability to pay']; Pen. Code, § 1202.4, subd. (d) [trial court shall consider 'defendant's inability to pay'].)" (*Gamache*, at p. 409.) The same is true here, and defendant's challenge fails for the same reason.

Defendant is correct, however, that the trial court erred in failing to deduct from the amount of the restitution fine the amount defendant was ordered to pay in restitution to the victim, and the Attorney General so concedes. At the time of sentencing in this case, if the victim "suffered economic loss," Government Code former section 13967, subdivision (c), compelled the trial court to order the defendant to pay restitution directly to the victim "in lieu of imposing all or a portion of the restitution fine." (Stats. 1992, ch. 682, § 4, p. 2923.) The restitution fine of $10,000 therefore must be reduced by the sum of $4,000.

## IV. CONCLUSION

The $10,000 restitution fine is reduced to $6,000. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment to reflect the modification of the restitution fine as described above. The clerk of the superior court also is directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**

69

C O P Y

PEOPLE v. CHARLES EDWARD CASE

*S057156*

### CONCURRING AND DISSENTING OPINION BY LIU, J.

Defendant Charles Case invoked his right to remain silent when he told detectives who asked to question him about a robbery-murder that he did not want to talk about a robbery-murder. Nevertheless, the detectives proceeded to ask a series of questions that quickly circled back to the robbery-murder and Case's possible role in it. In the course of the detectives' interrogation, Case revealed information that led the detectives to three witnesses who testified at Case's trial. Today's opinion correctly holds that the detectives' actions violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). But, in declining to suppress the three witnesses' testimony, the court "accept[s] the trial court's implicit finding that [the detectives] did not act in deliberate disregard of defendant's *Miranda* rights." (Maj. opn., *ante*, at p. 30.) The record does not support this finding.

At the suppression hearing, one of the detectives acknowledged that "it was his habit to continue to interrogate a suspect who invoked his *Miranda* rights to obtain statements that might be admissible to impeach the suspect." (Maj. opn., *ante*, at p. 18.) He also acknowledged that he asked Case questions that "paralleled" his investigation of the robbery-murder because he was trying "[t]o get admissions that would be held against [Case] at a later time." But the detective said he did not think he had deliberately violated *Miranda* because Case " 'didn't invoke his right not to talk to [him].' " (Maj. opn., *ante*, at p. 19.)

As today's opinion notes, the detective's interpretation of Case's statement is "objectively unreasonable" (maj. opn., *ante*, at p. 28), and the Attorney General

1

concedes that the detective's questioning of Case violated *Miranda*. Further, following a break in the questioning, the detective reentered the interrogation room and said to Case, " 'let me see if I'm understanding something. When I advised you of your rights, you just didn't want to talk about the murder and the robbery, but you wanted to talk about your alibi and that sort of thing; is that right?' " (Maj. opn., *ante*, at p. 19.) In light of the detective's practice of purposely violating *Miranda* as well as the objective unreasonableness of his claim that Case had not invoked his right to remain silent, this line of inquiry reads like an attempt to cover the tracks of the obvious constitutional violation rather than an effort, as the detective explained after the fact at the suppression hearing, to help " 'the learned attorneys . . . understand what [Case] meant' " (maj. opn., *ante*, at p. 20).

I do not believe we can distinguish *People v. Peevy* (1998) 17 Cal.4th 1184 on the ground that there was no deliberate violation of *Miranda* here. But *Peevy* is not controlling. *Peevy* held that the Fifth Amendment does not require exclusion of a statement that had been deliberately elicited in violation of *Miranda* for purposes of impeaching the defendant's trial testimony. (*Peevy*, at pp. 1193–1194.) *Peevy* did not address whether the exclusionary rule should apply to a statement elicited in deliberate violation of *Miranda* that identifies witnesses who then testify as part of the prosecution's case-in-chief. The exclusion of illegally obtained information from the prosecution's case-in-chief is the central (and pretty much only) mechanism to effectuate the goal of deterring improper police conduct in this context. (See *Harris v. New York* (1971) 401 U.S. 222, 225.)

Nevertheless, we do not have to address whether the deliberate *Miranda* violation requires exclusion of the three witnesses' testimony because the detectives would have inevitably discovered the identities of those witnesses. (See

*People v. Robles* (2000) 23 Cal.4th 789, 800–801.)  One of the detectives testified that he knew where Case worked and that "in the normal course of investigation," he would have "contact[ed] any other employees who worked there who knew the defendant and might know his activities."  In so doing, he would have encountered Stacey Billingsley and Greg Billingsley, who worked with Case.  And in all likelihood, the Billingsleys would have led the detective to Stacey's mother, Susan Burlingame, who lived with the Billingsleys and previously dated Case.

      In all other respects, I join today's opinion.


                                                       **LIU, J.**

**I CONCUR:**

**CHANEY, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Case

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S057156
**Date Filed:** May 31, 2018

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Jack Sapunor


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Maria Morga and Robin Kallman, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Jennevee H. De Guzman and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robin Kallman
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Caely E. Fallini
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 445-9555