Filed 8/1/23  Le v. Elevate Credit CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DANH LE, | B319914 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCP03900) |
| v. | |
| ELEVATE CREDIT, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Kristin S. Escalante, Judge.  Affirmed.

Zimmerman Reed, Caleb Lucas-Hansen Marker and Flinn T. Milligan for Plaintiff and Appellant.

Morrison & Foerster, Nancy R. Thomas, Matthew E. Ladew, and James R. Sigel for Defendants and Respondents.

_____

Plaintiff and appellant Danh Le (Le) took out 17 separate loans from defendant and respondent Rise Credit of California, LLC (Rise Credit).[1]  After either cancelling these loans or paying them back in full, Le initiated an arbitration proceeding, alleging that the interest rates to which he had agreed were unconscionable.  The arbitrator denied Le's claims, and Le petitioned the trial court to vacate the arbitration award.  The trial court denied Le's petition, and Le appeals.

We affirm.

## FACTUAL BACKGROUND

I. *The parties*

A. <u>Le</u>

Le is a highly educated software engineer.  After immigrating to the United States in 1975, he earned a B.S. and an M.S. from the Georgia Institute of Technology.  He then began to work for well-known companies, including Boeing, Raytheon, Hughes, and General Research Corporation, and he continued to do so during the time when he obtained the loans at issue and through the date of the arbitration hearing.  Le took all his coursework in English; he does his engineering work, for which he obtained a classified clearance, in English; and he testified in English with "no difficulty" at the arbitration hearing.

B. <u>Rise Credit</u>

Rise Credit's "business practice is to provide access to credit to non-prime borrowers."  It offers unsecured consumer loans at interest rates commensurate with the level of risk it incurs when

---

[1]   Elevate Credit, Inc. (Elevate), is also a respondent on appeal.  As explained by the arbitrator, "Elevate provides loan services to Rise [Credit], which is . . . the ultimate lender to consumers."

it offers those loans.  Rise Credit does not sue borrowers who default, which increases costs.  Its interest rates also reflect its other costs, including:  (1) origination costs (including advertising, underwriting, and payments to third-party vendors for applicant credit data); (2) servicing costs; (3) costs of funds; and (4) costs of consumer-facing contractual provisions, including a five-day rescission window and no prepayment penalties.

The lender uses an underwriting model that "pull[s] from several credit bureaus [and] data sources up to 10,000 different variables to . . . assess the capacity and the ability to repay."  It employs "35 to 40 data scientists on staff that are focused on . . . making the right decision and considering the capacity and the ability for a consumer to repay."

II. *Rise Credit's loan agreements*

When Rise Credit offers borrowers loans at the challenged interest rates, it provides them both time to decide and notice about the rates.  Applicants have 10 days to decide whether to accept, and roughly 20 percent of borrowers opt not to take the loan.  Even after a borrower accepts a loan, he or she has at least five days to change his mind and cancel it with no penalty.

In each loan agreement, just below the table with the payment summary, Rise Credit includes a bold, all-caps "WARNING" advising borrowers to consider other financing options:  "This Loan is not meant to help with your long-term credit needs.  Repeated or frequent use can create serious financial problems for you.  We encourage you to think about the costs and benefits of all alternatives before borrowing."  (Bolding omitted.)

Le's loan agreements also contained an arbitration provision.  Le's arbitration agreement with Rise Credit provides

3

that, in addition to the grounds enumerated in the Federal Arbitration Act, the parties have "the right to judicial review of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the conclusions of law are erroneous under the substantive law of California and applicable federal law."

III. *Le's loans*

From 2017 to 2019, Le executed 17 agreements with Rise Credit, each for $3,500 loans, quickly rescinding or repaying them each time. Although Le initially responded to a mailer from Rise Credit, he testified that he did not need a mailer to find or apply for a loan, and he could not even remember details about which lenders had sent him mailers.

Of his 17 loans, Le canceled six of them free of charge. As for the other 11 loans, Le repaid them all in "about 25 days"— taking advantage of provisions allowing borrowers to pay off their loans early with no prepayment penalty. At the time, Rise Credit's applicable interest rate for first-time borrowers was 135 percent to 235 percent (though the rates on Le's loans were all slightly under 200 percent). In total, Le "paid just a little over $7,500 in interest for all of his Rise [Credit] loans over just under three years, a small portion of the overall debt" of $59,500.

These 17 Rise Credit loans were not the only ones Le secured. During this same period, Le also availed himself of many other options, including friends and family, credit cards, credit union loans, 401(k) loans, and unsecured loans from at least six of Rise Credit's competitors. The loans that Le took out from Rise Credit's competitors similarly bore interest rates of 130 percent to 230 percent. Although Le suggested that "he had some personal need for funds mostly to help family members," he

has never identified "any medical urgency or other necessities of life for which he needed money."

IV. *Legislature adopts a rate cap after Le originated his loans*

In 2020, the California Legislature amended the Finance Code to prelude lenders from charging more than 36 percent interest on loans between $2,500 and $10,000. (Fin. Code, § 22304.5.) Because loans to nonprime borrowers would no longer be profitable at this interest rate given their credit profiles and related credit risks, Rise Credit stopped offering its product in California.

Le originated all of his loans before this change to the Finance Code, and he acknowledges that the recently amended statute does not apply to any of his loans.

## PROCEDURAL BACKGROUND

I. *The arbitration proceeding and award*

In or around June 2020, Le initiated the underlying arbitration proceeding against Rise Credit and Elevate, alleging claims stemming from his loans. By the time of the hearing, the "material issues of fact" were limited to "whether the interest rates at issue were unconscionable and unlawful" and whether Rise Credit's "conduct in entering into the loans was 'willful' such that it could affect the unconscionability analysis[.]"

During the hearing, among other things, Rise Credit presented a demonstrative exhibit (a "slider") showing the various ways Le could customize his loan terms when he borrowed from the lender. Le testified when he first applied for the loan with Rise Credit, or at any time during his loans with Rise Credit, he never saw the "slider" regarding his loans.

5

After a multiday hearing, the arbitrator issued a detailed 26-page award, finding the interest rate in this case "shockingly high," but rejecting Le's claim that the rate was unconscionable.

As relevant here, the arbitrator found that Rise Credit's "business practice is to provide access to credit to non-prime borrowers, who were not overly pressured into entering into, and had a meaningful choice regarding the loans at issue." In fact, Rise Credit warns borrowers and discloses, not hides, the high costs of its loans.

As for Le, the arbitrator found that he was "a serial borrower, knowledgeable and somewhat sophisticated in his endeavor to obtain funds for his needs," and that he "would go looking" for loans. The arbitrator determined that Le's sophisticated borrowing practices, including his prompt payments and cancellations, sometimes "depriv[ed] the lend[er] of the full fruits (interest) of their bargain." Le "<u>understood that these were expensive loans, and he understood the interest rates and attendant consequences. He knew how to rescind and have use of the funds for the longest time possible without cost, before returning them.</u>"

"[S]ignificantly," the arbitrator found, Le "has no debt now," and there was "no showing he used one loan to pay off another nor did he stack them." Rather, "[t]hroughout his relationship with [Rise Credit], he controlled his borrowing."

Regarding Le's claim that he had not seen the "slider" showing the ways he could customize the terms of his loans, the arbitrator expressly found him not credible.

The arbitrator then found that the interest rates in Rise Credit's loans to Le were not unconscionable by applying the factors set out in *De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th

6

966 (*De La Torre*), "the leading case on the issue," to the particular facts here.

First, the arbitrator found that the circumstances of Le's transactions evinced no significant degree of procedural unconscionability. There was "no oppression," as Le "is a well-educated person who speaks, understands, works in and [was] educated in English," and he testified that "based on his math training, he understands interest rates and understood those on his loans." There also was "no duress" or "sharp practices," emphasizing that Le "was never pressured by Rise [Credit] and could take [his] time to decide if the first or any of the 17 loans were right for him." And, "there was no surprise as to any term," all of which were "prominently displayed." Thus, Le "was well aware of the loan terms, and he kept coming back knowing them as well."

Second, the arbitrator found that Le failed to meet his burden of demonstrating that the interest rates for his 17 loans were substantively unconscionable. Le's arguments, the arbitrator explained, "ultimately fail[ed] to speak to the particulars of this borrower and his circumstances." While the arbitrator acknowledged that Rise Credit's interest rates had been high, she found that Le "presented no evidence that his credit profile was one that would justify lower rates." Nor had Le presented any "evidence regarding a conscionable rate based on [his] credit risk and [Rise Credit]'s costs," or any evidence that the lender's rates were somehow greater than those prevailing in the relevant market. The arbitrator further found that Le "got value for his 17 loans and paid them back so soon his interest payments and the costs of the loan to him were no[where] near

7

what they would have been if taken to term."  Accordingly, "[a]t all relevant times, he had control over his financial well-being."

## II.  *Le's petition to vacate the arbitration award*

On November 29, 2021, Le filed a petition to vacate the arbitration award.  He argued the trial court should vacate the award because the arbitrator exceeded "her authority, and the award cannot be fairly corrected."

## III.  *Trial court order denying Le's petition*

After full briefing and oral argument, the trial court denied Le's petition and confirmed the arbitration award.  The trial court began by explaining that, given the judicial review provision of the parties' arbitration agreement, its task was to "determine whether the arbitrator followed the correct unconscionability analysis, and whether the analysis was supported by the evidentiary record."  The trial court concluded that Le had "fail[ed] to demonstrate that the mixed findings of fact and law were without substantial evidence or authority."

With respect to procedural unconscionability, the trial court determined that Le had not made any arguments that the arbitrator's findings on oppression, surprise, sharp practices, duress, or bargaining power were unsupported by the record. Citing *De La Torre*, *supra*, 5 Cal.5th at page 983 and *Torrecillas v. Fitness Internat., LLC* (2020) 52 Cal.App.5th 485, 493 (*Torrecillas*), it rejected Le's argument that the adhesive nature of the loan contracts was, by itself, sufficient to establish procedural unconscionability, explaining that "adhesion alone does not automatically render a contract procedurally unconscionable."  "At worst," the "[a]rbitrator should have found a minimal to low degree of unconscionability."

With respect to substantive unconscionability, the trial court rejected Le's argument that the "evidence demonstrates that the interest rate is excessive, apparently as a matter of law." Under *De La Torre*, *supra*, 5 Cal.5th at page 984, unconscionability analysis must be based on "'the circumstances of the case, taking into account the bargaining process and prevailing market conditions.'" And, the arbitrator had properly considered evidence of the parties' bargaining process and the available rates in the market.

Ultimately, the trial court concluded that Le had "point[ed] to no evidence that would establish that, as a matter of law, the 200% interest rates were unreasonably favorable" to Rise Credit.

IV. *Appeal*

Le's timely appeal from the trial court's order ensued.

## DISCUSSION

I. *Standard of review*

As the parties agree, "[o]n appeal from an order confirming an arbitration award, we review the trial court's order (not the arbitration award) under a de novo standard." (*Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892, fn. 7.)

II. *The trial court applied the correct standard of review*

Throughout his briefs, Le argues that the trial court erred by limiting "its review only to the grounds enumerated in [Code of Civil Procedure] § 1286.2 and therefore engaged in an overly and improperly deferential review of the Arbitrator's Award." We disagree.

In general, "only limited judicial review" of an arbitration award "is available." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443.) Here, the arbitration agreement delineates the precise scope of that limited judicial

9

review:  the parties agreed that they have "the right to judicial review of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the conclusions of law are erroneous under the substantive law of California and applicable federal law."  The trial court here correctly applied these standards of review.

Urging us to reverse, Le raises four objections.  We reject each in turn.

First, the trial court did not, as Le claims, disregard the parties' agreement on the scope of judicial review of an arbitration award.  To the contrary, while the trial court began by describing the general principles applicable to such review absent any agreement, it expressly noted and adhered to the terms of the parties' arbitration agreement.

Second, Le misunderstands "substantial evidence" review. Le insists that the trial court erroneously saw its role as "affirming and validating the findings of the Arbitrator," citing a number of passages in which the trial court determined that the evidence was sufficient to support the arbitrator's findings.  But that, of course, is precisely what "substantial evidence" review requires:  factual findings must be affirmed as long as the evidence is sufficient to support them, regardless of whether another factfinder might have reached a different conclusion. (*Bowers v. Barnards* (1984) 150 Cal.App.3d 870, 873–874.)  And even if, as Le insists, the "Arbitrator's resolution of a legal question is entitled to literally no weight", Le ignores the fact that "while unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question," and the arbitrator's factual findings are entitled to deference.  (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 489.)

10

Third, to the extent Le argues for de novo review of the arbitrator's factual determinations, that argument is both forfeited and meritless. Le never argued for independent review below; to the contrary, he appeared to acknowledge his need to show that the arbitrator "failed to make decisions supported by substantial evidence." Thus, Le has thus forfeited the argument on appeal. (See *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 769 ["'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider'"].)

In any event, even if preserved, the argument lacks merit. The controlling contractual language expressly provides for judicial review of "whether the findings of fact rendered by the arbitrator are supported by substantial evidence"—not, as Le now appears to insist, an independent judicial determination of the facts.

Finally, even if the trial court had somehow misunderstood the standard of review, that error would be harmless. As discussed below, the record amply supports the arbitrator's award. Thus, the trial court reached the correct result. (*Prickett v. Bonnier Corp.* (2020) 55 Cal.App.5th 891, 897 [affirming where "any error . . . resulted in the correct result, making it ineluctably harmless"].)

III. *The trial court properly denied Le's petition to vacate the arbitration award*

A. <u>Relevant law</u>

In *De La Torre*, *supra*, 5 Cal.5th at page 976, our Supreme Court reaffirmed that "[a]s with any other price term in an agreement governed by California law, an interest rate may be

11

deemed unconscionable." (*Ibid*.) But the mere fact that an interest rate is high does not demonstrate that it is unconscionable—after all, "[u]nsecured loans made to high-risk borrowers often justify high rates." (*Id*. at p. 973.) Instead, "a court declares unconscionable only those interest rates that—in light of the totality of a transaction's bargaining context—are so 'unreasonably and unexpectedly harsh' as to be 'unduly oppressive' or 'shock the conscience.'" (*Ibid*.) In other words, "[s]ome measure of both procedural and substantive unconscionability must be present—although given the sliding-scale nature of the doctrine, more of one kind mitigates how much of the other kind is needed." (*Id*. at p. 982.)

Procedural unconscionability consists of "oppression or surprise." (*De La Torre, supra*, 5 Cal.5th at p. 982.) "The court [or as here, the arbitrator] must consider whether there was (1) undue oppression arising from 'an inequality of bargaining power,' including the various factors tending to show relative bargaining power such as the parties' sophistication, their cognitive limitations, and the availability of alternatives; and (2) surprise owing to, for example, the 'terms of the bargain [being] hidden in a prolix printed form' or pressure to hurry and sign." (*Id*. at p. 983.) "In short, a determination of procedural unconscionability may well be 'highly dependent on context.'" (*Ibid*.)

Substantive unconscionability is likewise context-dependent. (*De La Torre, supra*, 5 Cal.5th at p. 983.) "[I]t is not sufficient for a court to consider only whether 'the price exceeds cost or fair value'"; the court must also consider, among other things, "'the basis and justification for the price.'" (*Ibid*.) "If, for example, the interest rate is high because the borrowers of the

12

loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability."  (*Ibid.*)  So too does evidence that "the price was set by a 'freely competitive market.'"  (*Id.* at p. 984.)

Importantly, *De La Torre, supra*, 5 Cal.5th at page 993 admonished that "courts must proceed with caution in this area," observing that "few courts have ever declared contracts unconscionable," especially "where the unconscionable term alleged is the interest rate on a loan" (*id.* at p. 992).  Indeed, as *De La Torre* emphasized (and as seems to remain true today given the parties' failure to identify any additional cases), only a single California appellate case—*Carboni v. Arrospide* (1991) 2 Cal.App.4th 76 (*Carboni*)—appears to have ever found an interest rate unconscionable.  (*De La Torre, supra*, at p. 992.)

In *Carboni*, the agreement in question—for a loan of $4,000 that subsequently ballooned to $99,000—not only provided for a 200 percent interest rate, but it was also secured by a deed of trust on a residence the borrower owned.  (*Carboni, supra*, 2 Cal.App.4th at p. 79.)  In that case, the record established the requisite "oppression" to support a finding of procedural unconscionability:  the borrower was under "emotional distress" stemming from medical expenses, and he "had unequal bargaining power because he was unable to obtain a loan from other sources."  (*Id.* at pp. 85–86.)  The resulting 200 percent interest rate "was approximately 10 times the rate then prevailing in the credit market for similar loans," thus making it "substantively unconscionable."  (*Id.* at p. 84.)

13

B.  <u>Substantial evidence supports the arbitrator's determination that Le did not demonstrate unconscionability</u>

1. *Procedural unconscionability*

Substantial evidence supports the finding that oppression and surprise were absent here.

First, Le did not prove oppression.  Le is a well-educated, sophisticated consumer who had, and availed himself of, numerous market alternatives.  (*De La Torre, supra*, 5 Cal.5th at p. 983 [highlighting factors "such as the parties' sophistication, their cognitive limitations, and the availability of alternatives"].)  Le has a master's degree and advanced math training, which allowed him to understand the interest rates on his loans.  His own loan history demonstrates his sophistication with Rise Credit's loan products:  he used his ability to rescind, set his payment amount, and prepay without penalty.  Le acknowledged that Rise Credit never pressured him.  And Le never testified that Rise Credit loans caused him harm or that he would have preferred not to have taken them; indeed, he testified he found them valuable.

Second, Le did not prove surprise.  In fact, in this appeal, he now concedes as much.  That concession is warranted given the facts that the interest rate terms were prominently disclosed, Le testified he was aware of them, and the arbitrator found no evidence of any sharp practices.

Urging us to reverse, Le asserts that his contracts with Rise Credit were adhesive and presented on a take-it-or-leave it basis.  But the mere fact that a contract is adhesive does not necessarily suffice to prove procedural unconscionability.  "Whether the agreement was or was not a contract of adhesion is not the core question.  Rather, from the standpoint of

14

determining whether there was procedural unconscionability, the core issues are surprise and oppression." (*Torrecillas*, *supra*, 52 Cal.App.5th at p. 493.) While the "[u]nconscionability analysis begins with an inquiry into whether the contract is one of adhesion" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113, abrogated in part on another ground in *AT&T Mobility LLC v. Conception* (2011) 563 U.S. 333, 340), "[t]he pertinent question . . . is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required" (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 126). Otherwise, "every form contract not subject to negotiation between the parties would be deemed oppressive, totally disregarding the undisputed ability of a contracting party to choose to obtain that for which he bargained from other sources." (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 769.)

Thus, whether an adhesive contract demonstrates oppression depends on the circumstances. Those circumstances do not exist here. The challenged interest rates were not buried in a form contract that Le was unlikely to read. (*Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 582 ["Appellate courts considering unconscionability challenges in consumer cases have routinely found the procedural element satisfied where the agreement containing the challenged provision was a contract of adhesion"].) After all, the purportedly unconscionable term was the central focus of the parties' bargain—namely, the price.[2] (See *De La Torre*, *supra*, 5 Cal.5th at pp. 982–983

_____

[2]     Even if the mere fact that these contracts were adhesive was enough to establish some minimal degree of procedural

15

[making no mention of this factor in describing factors governing unconscionability challenges to interest rates].)

Moreover, Le's repeated attacks on the arbitrator's finding that Le had the option to "'walk away'" from Rise Credit's offers are misguided. While Le may be correct that a party can theoretically walk away from any adhesive contract, the ability to do so may undermine a finding of "oppression," particularly under circumstances such as those presented here. (*De La Torre*, *supra*, 5 Cal.5th at p. 983.) As the arbitrator correctly noted, Le "clearly had other sources from which he could borrow." While Le now insists that he was in "severe financial straits", he points to no evidence that would have compelled the arbitrator to find that he faced anything like the sort of oppression confronted by the borrower in *Carboni*, *supra*, 2 Cal.App.4th at page 86.

Le's contention that the circumstances of his bargain were "oppressive" due to his own lack of sophistication is similarly meritless. Again, as the arbitrator found, Le is a "well-educated" engineer, and he admitted that he "understands interest rates and understood those on his loans." In fact, Le understood Rise Credit's loans well enough to take advantage of their cancellation and prepayment terms and avoid making substantial interest payments.

Furthermore, the arbitrator did not err in emphasizing the fact that Rise Credit did not exert any pressure on him to execute the loan documents. Certainly, oppression may exist when a

---

unconscionability, Le's claims would still fail. As the trial court recognized, Le failed to establish the high degree of substantive unconscionability that would be required to set aside the award given a "minimal to low degree" of procedural unconscionability stemming from the contracts being adhesive.

16

lender takes advantage of its position as the sole option for a party under pressure from external circumstances. (See, e.g., *Carboni*, *supra*, 2 Cal.App.4th at p. 86.) The fact that Rise Credit imposed no "pressure to hurry and sign" (*De La Torre*, *supra*, 5 Cal.5th at p. 983)—and indeed, even allowed Le to cancel his loans penalty free days after he had signed, as Le did on multiple occasions—further supports the arbitrator's conclusion that Le failed to prove procedural unconscionability.

Le's attacks on the integrity of the "'bargaining process'" likewise fail. Le appears to criticize Rise Credit for not providing an amortization schedule, but he did not testify that he wanted any such schedule, much less that it would have affected his choice to borrow. This failure is especially pronounced considering the loan agreement discloses a detailed payment schedule. Le also argues that Rise Credit should have disclosed "that borrowing just a few dollars less would have saved [borrowers] thousands in additional interest as the rates would have then been capped at 30% instead of 200%." Yet Le points to no evidence that Rise Credit or anyone else would have provided him such a loan given his credit history. Nor did Le testify that he would have preferred a smaller loan amount. Similarly, Le complains that Rise Credit advertised its loans to those who might seek them—e.g., high-risk borrowers. But he fails to explain how these mailers affected his particular transactions with Rise Credit (or address his testimony that he did not need a mailer to find or apply for a loan).

Finally, Le attempts to raise an evidentiary "dispute" regarding Rise Credit's demonstrative exhibit (the slider), which showed the process of applying for a loan on the lender's Web site at the time Le applied for his loan. Apparently hoping to set

17

aside the arbitrator's refusal to credit Le's testimony that he had not seen the slider that allowed him to control aspects of his loan like the duration and loan amount, Le contends he was the "sole witness with personal knowledge" of what Rise Credit's application procedures were when he applied for his loans. That is untrue: a Rise Credit witness explained that the demonstrative exhibit reflected precisely what Le saw when he applied and that he was required to choose the duration and loan amount before submitting the loan applications. Regardless, even if Le somehow had not seen the slider, it would not matter, as he still failed to prove any meaningful oppression.

2. *Substantive unconscionability*

Because Le demonstrated no procedural unconscionability, his claims necessarily fail. Our analysis could stop here. For the sake of completeness, we address, and reject, Le's argument that his contracts with Rise Credit were substantively unconscionable.

As Le now "concedes," "the rates [were] set in a competitive marketplace." That alone diminishes any inference that the loan terms were unduly harsh. (*De La Torre*, *supra*, 5 Cal.5th at p. 984; cf. *Carboni*, *supra*, 2 Cal.App.4th at p. 84 [emphasizing that the challenged rate was 10 times that prevailing marketwide for similar loans].)

Rise Credit's rates also reflected the costs and risks that it incurred when it loaned to borrowers such as Le. As the arbitrator found, Le "presented no evidence that his credit profile was one that would justify lower rates." He had a heavy debt load and paid similar rates on other loans, and "[t]here is no wonder he was labeled a credit risk by [Rise Credit's] algorithm."

And, unlike the fully secured loan in *Carboni*, *supra*, 2 Cal.App.4th at page 84, Rise Credit's loans to nonprime

18

borrowers like Le were unsecured and carried a substantial of risk default.  (*De La Torre*, *supra*, 5 Cal.5th at p. 983 [where "borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability"].)  The interest rates reflect the results of a complex underwriting process that took millions of dollars, scores of data analysts, and years to develop.  In addition to these underwriting costs, the interest rates also reflected Rise Credit's other costs.

What is more, as the arbitrator found, Le "got value for his 17 loans."  Le admitted as much.  And because Le understood the terms of his loans, he controlled their costs, paying only a "small portion" of the overall debt he incurred in interest (approximately 13%).  Especially in these circumstances, the arbitrator had ample basis to find that Rise Credit's interest rates were not "'overly harsh'" or "'so one-sided as to shock the conscience.'" (*De La Torre*, *supra*, 5 Cal.5th at p. 982.)

Invoking Financial Code section 22304.5, Le insists that while it does not apply to his loans, the 36 percent rate cap the Legislature subsequently imposed necessarily demonstrates that the interest rates on his loans were unconscionable.  But as *De La Torre* made clear, "whether an interest rate is unconscionable is fundamentally a different inquiry than whether the rate exceeds a numerical cap."  (*De La Torre*, *supra*, 5 Cal.5th at p. 976.)  In other words, the Legislature's decision to impose a "bright-line rule policing a single facet of loan agreement" (*ibid.*) does not demonstrate, as Le suggests, that Rise Credit's interest rates in its loans to Le were unconscionable as a matter of law.

19

Le likewise cannot prevail here by contending that the price of Rise Credit's loans so far exceeded the lender's costs as to render them unconscionable.  Le focuses exclusively on Rise Credit's "cost of borrowing," which he asserts ranged "from 10–13%."  He cites testimony that the interest rate at which Rise Credit borrowed from other lenders in 2019 was "around 13 percent."  Yet Le ignores the fact that Rise Credit's cost of borrowing was only one of its costs.  (*De La Torre*, *supra*, 5 Cal.5th at p. 983.)

Nor can Le convert one of these costs—the high risk of default—into an argument that Rise Credit's interest rates reflecting that default risk are unconscionable.  Again, as *De La Torre* recognized, where "the interest rate is high because the borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability." (*De La Torre*, *supra*, 5 Cal.5th at p. 983.)

Moreover, Le's contention that it is "undisputed that these loans are built to fail" is belied by the record.  That 30 percent of borrowers end up defaulting does not mean that Rise Credit aims for or desires a 30 percent default rate.

Similarly, Le is wrong to insist that the fact that Rise Credit purportedly "steered" borrowers to non-rate-capped loans above $2,500 "cuts *dispositively* against any argument that the interest rate is a product of the riskiness" of borrowers like Le.  Le points to nothing in the record that Rise Credit could or did profitably offer loans below $2,500 at a capped interest rate, or that contradicts the lender's evidence establishing that interest rates on the loans it did offer reflect the risk of these loans.

Furthermore, Le cannot demonstrate that he was entitled to lower rates because he was "a particularly diligent borrower" who repaid his loans. Again, Le fails to direct us to any evidence in the record demonstrating that the weight given to payment history in Rise Credit's underwriting model was improper, that the arbitrator was wrong to find that there was "no wonder" that Le was labeled a credit risk, or that otherwise compelled a finding that the rates charged Le based on his actual credit history were "so 'unreasonably and unexpectedly harsh' as to be 'unduly oppressive' or 'shock the conscience.'" (*De La Torre*, *supra*, 5 Cal.5th at p. 973.)

The many nonbinding, out-of-jurisdiction cases[3] that Le relies upon do not compel a different conclusion. Aside from being factually distinguishable, Le offers us no reason to disregard our own Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Finally, Le's reliance upon a trial court's proposed statement of decision in a still-pending case involving a different plaintiff, a different lender, and different loan products, *De La Torre v. CashCall, Inc.*, No. 19CIV01235 (San Mateo Super. Ct. Nov. 17, 2022) is misplaced. Aside from the fact that that case has zero precedential value, it utterly lacks persuasive

---

[3] *James v. National Financial, LLC* (Del.Ch. 2016) 132 A.3d 799, 837; *State ex rel. King v. B&B Investment Group, Inc.* (N.M. 2014) 329 P.3d 658, 662, 667; *Daye v. Community Financial Loan Service Centers, LLC* (D.N.M. 2017) 280 F.Supp.3d 1222, 1253–1255; *Capital Loan Corp. v. Platero* (Navajo Dt. Ct., Jan. 25, 2000, No. 2000 CP-CV-001); *Drogorub v. Payday Loan Store of WI, Inc.* (Wis.Ct.App. 2012, Dec. 18, 2012, No. 2012AP151) 2012 WL 6571696, at p. *4.

value.  That a court found different loan products to different plaintiffs made by a different lender both procedurally and substantively unconscionable sheds no light on whether Rise Credit's loans to Le were unconscionable.

## DISPOSITION

The order is affirmed.  Elevate and Rise Credit are entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT